## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

JESSICA STAHLMAN, JEREMY
SESSLER, and RONALD SMITH,
individually and on behalf of all others
similarly situated,

|  |
|---|
| Case No. _____ |

**JURY TRIAL DEMANDED**

Plaintiffs,

v.

FORD MOTOR COMPANY, a
Delaware Limited Liability Company,

Defendant.

## CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................ 1

II.    JURISDICTION ................................................................................. 5

III.   VENUE ............................................................................................... 6

IV.    PARTIES ............................................................................................ 6

       A.     Plaintiffs ................................................................................. 6

              1.     Jessica Stahlman (Florida) .......................................... 6

              2.     Jeremy Sessler (New York) ........................................ 7

              3.     Ronald ("RJ") Smith (North Carolina) ...................... 8

       B.     Defendant .............................................................................. 10

V.     FACTUAL ALLEGATIONS ........................................................... 11

       A.     Ford marketed the Fire Defect Vehicles as family-friendly,
              functional, safe, and reliable, and knew these attributes
              were material to consumers. ................................................ 11

       B.     Ford's Vehicle Warranties ................................................... 18

       C.     The Spontaneous Fire Defect .............................................. 19

       D.     Ford knew or should have known of the Spontaneous Fire
              Defect before it disclosed the Defect to Plaintiffs. ........... 22

              1.     Ford's durability testing should have uncovered
                     the Spontaneous Fire Defect. ..................................... 22

              2.     Ford knew about the Spontaneous Fire Defect
                     from reports of fires in sixteen Fire Defect
                     Vehicles and its own investigation. ........................... 24

       E.     There is an agency relationship between Ford and Ford
              dealerships. .......................................................................... 26

VI.   TOLLING OF THE STATUTE OF LIMITATIONS .................................. 29

    A.   Discovery Rule Tolling ..................................................... 29

    B.   Estoppel ........................................................................... 30

VII.  CLASS ALLEGATIONS ............................................................... 31

VIII. CLAIMS ......................................................................................... 35

    A.   Nationwide Claims ........................................................... 35

COUNT I  VIOLATION OF THE MAGNUSON-MOSS WARRANTY
ACT (15 U.S.C. § 2301, *et seq*.)........................................................ 35

COUNT II  UNJUST ENRICHMENT (COMMON LAW)................................ 40

    B.   State-Specific Claims ........................................................ 41

COUNT III  VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE
TRADE PRACTICES ACT (FLA. STAT. § 501.201, *ET SEQ.*) .................... 41

COUNT IV  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY UNDER FLORIDA LAW (Fla. Stat.
§ 672.314) ....................................................................................... 46

COUNT V  VIOLATION OF NEW YORK'S DECEPTIVE ACTS
AND PRACTICES (N.Y. GEN. BUS. LAW § 349, *ET SEQ.*) ......................... 48

COUNT VI  VIOLATION OF NEW YORK'S FALSE
ADVERTISING ACT (N.Y. GEN. BUS. LAW § 350) ................................. 53

COUNT VII  BREACH OF NEW YORK'S IMPLIED WARRANTY
OF MERCHANTABILITY (N.Y. U.C.C. LAW §§ 2-314; 2A-
212)................................................................................................. 55

COUNT VIII  VIOLATION OF NORTH CAROLINA'S UNFAIR
AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN.
STAT. § 75-1.1, *ET SEQ.*)................................................................. 57

COUNT IX  BREACH OF IMPLIED WARRANTY OF
MERCHANTABILITY (N.C. GEN. STAT. § 25-2-314) ............................. 61

REQUEST FOR RELIEF ...................................................................... 63

DEMAND FOR JURY TRIAL ............................................................................ 64

Plaintiffs file this lawsuit individually and on behalf of proposed nationwide and statewide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I.     INTRODUCTION

1.     The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to promptly warn consumers and fix or replace a car where the manufacturer learns of a defect that implicates serious safety issues.

2.     Ford Motor Company ("Ford") breached these fundamental duties by selling Ford Expeditions and Lincoln Navigators that were dangerously defective and prone to catching fire, including while driving, while parked but on, and while parked and off. Then, though Ford knew or should have known of the fire risk prior to launching the vehicles, it did nothing to warn owners and lessees until very recently. And to this day, Ford has yet to provide a remedy for the defect or even suggest when it might be able to offer a remedy.

3.     Model year 2021 Ford Expedition and Lincoln Navigator sport utility vehicles (the "Fire Defect Vehicles")[1] contain a defect in the engine compartment

---

[1] So far, Ford has recalled only model year 2021 Expeditions and Navigators. Plaintiffs' counsel continues to investigate whether other model years contain the

that can cause spontaneous fire while driving, while parked but on, and while parked and off (the "Spontaneous Fire Defect").

4.     The Spontaneous Fire Defect exposes putative class members to an unreasonable risk of accident, injury, death, or property damage if their vehicle catches fire while in operation or, perhaps more commonly, spontaneously ignites while the vehicle is parked at the class member's home, on a public street, or in a public parking lot. The Spontaneous Fire Defect also exposes passengers, other drivers on the road, neighbors, owners of other cars parked near the Fire Defect Vehicles, and other bystanders to an unreasonable risk of accident, injury, death, and property damage.

5.     The catastrophic fire risk is the direct result of a defect that was known or should have been known to Ford and is still unremedied by Ford. Not only did Ford fail to disclose the Spontaneous Fire Defect to consumers both before and after their purchases of the premium-priced model year 2021 Ford Expeditions and Lincoln Navigators, but it also misrepresented the vehicles' safety, reliability, functionality, and quality by this omission. Ford also omitted the consequences, including the serious safety hazards and monetary harm caused by the Spontaneous Fire Defect—e.g., damage to a home and injury or death to

---

same defect and should, therefore, be recalled. Plaintiffs may update the definition of Fire Defect Vehicles to include additional model years.

persons inhabiting that home should the Fire Defect Vehicle spontaneously ignite while the vehicle is parked adjacent to the house or in an attached garage.

6.     To date, there have been sixteen fires in a vehicle population of just 39,000, a number that Ford acknowledges is ***statistically significant***. The fires have all occurred in the engine compartment of the Fire Defect Vehicles, but Ford has yet to identify the root cause of these fires or the engine compartment component that is igniting.

7.     Instead, Ford is merely advising owners and lessees to park the Fire Defect Vehicles away from homes and property. A vehicle that cannot be driven without an unreasonable fire risk and cannot be parked or stored in or near the owner's residence is not fit for its ordinary purpose. Ford does not tell Fire Defect Vehicle owners and lessees just what constitutes a "safe" distance from a vehicle erupting in fire or explain what owners should do with their vehicles if they have no such place to park their vehicles. This places an unfair burden on class members who are unable to safely operate vehicles they paid a premium for and are unable to park in their garage (and may have to park quite far away from their homes to park away from other vehicles).

8.     Many putative class members, like Plaintiff Smith, are not even able to comply with Ford's directive to park their Fire Defect Vehicles a "safe" distance from structures or other vehicles near their residences, let alone at places they

might wish to drive their vehicles. Still others, justifiably not wanting to bear the risk of a catastrophic fire, may be forced to sell their Fire Defect Vehicles at a loss because of Ford's conduct and inability or unwillingness to provide any sort of fix. The Hobson's choice foisted on consumers by Ford is nothing short of outrageous.

9.      Ford knew or should have known about the Spontaneous Fire Defect before the Fire Defect Vehicles went to market, and certainly knew well-before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Fire Defect Vehicles; (2) the direct and public reports of fires in sixteen Fire Defect Vehicles; and (3) Ford's own investigation of fires in the Fire Defect Vehicles.

10.     Ford offers no actual remedy for the Spontaneous Fire Defect and offers no reimbursement to Fire Defect Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Because no repair is available, putative class members are left without a safely operable vehicle for an unknown and potentially lengthy period.

11.     To add further insult to injury, rather than do the right thing and globally offer every consumer a buy back of their Fire Defect Vehicle at a fair price—e.g., the Blue Book value on the day before the recall was announced—or at least offer to provide a comparable loaner or large rental SUV while storing the dangerous Fire Defect Vehicles until such time as it is able to repair them, Ford has done nothing of the sort.

12.     Because of Ford's omissions and misrepresentations regarding the Spontaneous Fire Defect and failure to act more quickly in disclosing and providing a remedy, it has violated state consumer protection acts, been unjustly enriched, and breached implied warranties of merchantability. Plaintiffs and other owners and lessees of the Fire Defect Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiffs and the putative class members known of the Spontaneous Fire Defect, then they would either not have purchased or leased those vehicles or would have paid substantially less for them. Fires in the Fire Defect Vehicles also necessitate expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of use, and other miscellaneous costs.

13.     Plaintiffs bring this class action to redress Ford's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, state consumer protection acts, state implied warranty acts, and unjust enrichment at common law.

## II.    JURISDICTION

14.     This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class and each Subclass (as defined herein); the aggregate amount in

controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

15.     This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

### III.   VENUE

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

### IV.   PARTIES

**A.     Plaintiffs**

**1.     Jessica Stahlman (Florida)**

17.     Plaintiff and proposed class representative Jessica Stahlman ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Mount Dora, Florida. Plaintiff purchased a 2021 Ford Expedition in March 2021 from Mullinax Ford in Apopka, Florida. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff and her husband purchased this vehicle through their jointly owned and managed dry-cleaning company. The

vehicle was purchased primarily for use by company employees on delivery routes. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff. Since notice of the recall, Plaintiff completely ceased all use or operation of the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. She cannot risk her safety, or that of her employees, by driving it, and continues to pay for and insure a vehicle she's owned for only a year while it sits unused. Plaintiff also cannot park the vehicle off or away from her business property for insurance purposes, so the dangerous Fire Defect Vehicle must sit parked behind her dry-cleaning business. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

### 2. Jeremy Sessler (New York)

18. Plaintiff and proposed class representative Jeremy Sessler ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Seaford, New York. Plaintiff and his wife leased a 2021 Lincoln Navigator in March 2021 from Hassett Ford in Wantagh, New York. Plaintiff's Lincoln Navigator is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff leased it as the primary

vehicle for his wife and three young children. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff. Plaintiff is now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. Plaintiff has three young children that all ride in car seats and extracting them all safely and quickly in the event of an engine fire would be difficult if not impossible. In addition, it is inconvenient and unsafe for Plaintiff to park the Fire Defect Vehicle on the street—under Ford's instruction to park outside and away from structures and other vehicles—with three small children that must be loaded into the vehicle daily. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

### 3. Ronald ("RJ") Smith (North Carolina)

19.    Plaintiff and proposed class representative RJ Smith ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Raleigh, North Carolina. Plaintiff and his wife leased a 2021 Lincoln Navigator in July 2021 from Leith, Inc. in Raleigh, North Carolina. Plaintiff's Lincoln Navigator is a Fire Defect

Vehicle equipped with the Spontaneous Fire Defect. Plaintiff leased it as the primary vehicle for his wife and three young children. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff. Plaintiff is now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. Plaintiff's three small children must always ride in car seats and extracting them safely and quickly in the event of an engine fire would be difficult if not impossible. In addition, it is not feasible for Plaintiff to park the Fire Defect Vehicle outside his garage and away from structures and other vehicles as Ford has instructed because there are no such reasonably accessible spaces near Plaintiff's home. Plaintiff's driveway is steeply sloped and not suitable or safe to park or access the vehicle on it. Parking the Fire Defect Vehicle outside also risks damaging the vehicle given the surrounding trees and climate. Moreover, if Plaintiff switches vehicles with his wife, he will incur more than double the fuel costs to commute to work. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**B.     Defendant**

20.     Defendant Ford Motor Company ("Ford") is a Delaware limited

liability company organized and existing under the laws of the State of Delaware.

Ford's principal place of business and headquarters is One American Road,

Dearborn, Michigan 48126.

21.     Ford is a motor vehicle manufacturer and a licensed distributor of

new, previously untitled Ford and Lincoln brand motor vehicles. The Ford brand is

one of the "Big Three" American automobile brands. Lincoln is Ford's luxury

automobile brand. Ford engages in commerce by distributing and selling new and

used passenger cars and motor vehicles under its Ford and Lincoln brands.

22.     Ford, through its various entities, designs, manufactures, markets,

distributes, and sells automobiles throughout the U.S. and worldwide. Ford and its

agents designed and manufactured the Fire Defect Vehicles. Ford also developed

and disseminated the owner's manuals and warranty booklets, advertisements,

brochures, and other promotional materials relating to the Fire Defect Vehicles,

with the intent that such documents be purposely distributed throughout all fifty

states. Ford is engaged in interstate commerce, selling vehicles through its network

in every state of the United States.

23.     As further detailed below, Ford- and Lincoln-authorized automobile

dealerships act as Ford's agents in selling automobiles under the Ford and Lincoln

brand names and disseminating vehicle information provided by Ford to customers. At all relevant times, Ford's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Ford's manufacturer warranty under the contracts between Ford and its nearly 10,000 authorized dealerships worldwide.

## V.    FACTUAL ALLEGATIONS

**A.    Ford marketed the Fire Defect Vehicles as family-friendly, functional, safe, and reliable, and knew these attributes were material to consumers.**

24.    Both the Ford and Lincoln Fire Defect Vehicles are marketed to consumers as family-friendly, functional, safe, reliable vehicles, and Ford knew these qualities were material to consumers in marketing them in this manner. These qualities were in fact material to Plaintiffs.

25.    In the sales brochure for the 2021 Ford Expedition, Ford focuses on families from the start because it knew this attribute was material to Plaintiffs and putative class members, saying "Whether you choose Expedition or Expedition MAX – which is nearly a foot longer and can carry 16.9 more cu. ft. of gear – *these spacious vehicles are designed with you and your family in mind*." (Emphasis added.) And, "For years, we've put our hearts and souls into building a better big for your family and your adventures."[2]

_____

[2] *See* **Exhibit 1**, MY 2021 Ford Expedition brochure, at 2.

> How big is big enough when it comes to maximizing your adventures? That's for you to decide – and the 2021 Ford Expedition® to provide.
>
> Whether you choose Expedition or Expedition MAX – which is nearly a foot longer and can carry 16.9 more cu. ft. of gear[1] – these spacious vehicles are designed with you and your family in mind. From roomy interiors with seating for up to 8 in a range of durable fabrics and available leather trims, to innovative technologies and standard Ford Co-Pilot360™ that can help you navigate new roads,[2] in Expedition, every drive is big on comfort and convenience. And, with 2 EcoBoost® engines to choose from, no matter where you're headed, you'll have plenty of power to help get you there.
>
> For years, we've put our hearts and souls into building a better big for your family and your adventures. The 2021 Ford Expedition is one of our best yet.

26.     Ford also touts the Expedition's accommodation of child seats, saying the following: "And, with available 2nd-row power-folding tip-and-slide seats, you can keep a child seat secured in any section of the seat, while simply sliding it forward to allow passengers to get into the 3rd row."[3]

> Take a seat in the available 10-way power driver's seat, settle into the available 2nd-row captain's chairs – available in either leather or ActiveX™ Seating Material – or relax in the available power-reclining PowerFold® 3rd-row seats with a 60/40 split, and you'll quickly see that Ford Expedition® is big on space and even bigger on comfort. With plenty of space for up to 8 passengers, everyone will appreciate the expansive room. And, with available 2nd-row power-folding tip-and-slide seats, you can keep a child seat secured in any section of the seat, while simply sliding it forward to allow passengers to get into the 3rd row. No matter where you find your place, in Expedition, you're sure to find your comfort zone.

27.     Ford also sells consumers on the size and functionality of the Expedition—another significant material feature for families—noting the Expedition's extra cargo room and larger rear door opening for "easier entry and exit."[4]

---

[3] *See id.* at 4.
[4] *See id.* at 5.



There's a lot that goes into your everyday, so you need a vehicle that can handle just about anything. Like the new 5-passenger Ford Expedition® STX. With STX, you'll always have available cargo room behind the 2nd row – without the need to fold down any seats. And, for even more space – nearly a foot more length with an additional 16.9 cu. ft.¹ to accommodate most anything you need to carry – the Expedition MAX gives you all the room you need, in all the right places. Larger rear door openings make for easier entry and exit. An available advanced cargo manager shelf helps keep things in order. And an available hands-free, foot-activated liftgate opens with a simple wave of your foot under the bumper – all while keeping your key fob in your pocket or purse. A liftgate glass that can be opened manually or with the liftgate itself makes accessing everything you're carrying easier, too.

28.     In addition to the Expedition's suitability for families, Ford also stressed the alleged safety of the vehicles, as Ford knew this was a material attribute for consumers. Promising consumers can "[c]ommand the road with confidence" in the Expedition, Ford touted various safety features like pre-collision assist, blind spot alerts, lane-keeping system, and rear-view cameras in the Fire Defect Vehicles.[5]

**COMMAND THE ROAD WITH CONFIDENCE.**
FORD CO-PILOT360™ TECHNOLOGY

**FORD CO-PILOT360**
*Standard on every 2021 Ford Expedition®*

Change lanes. See what's coming. Help avoid potential collision hazards. Our well-rounded suite of Ford Co-Pilot360 driver-assist features can help you in a variety of situations and conditions, as they can supplement your driving skills¹ and help you feel confidently in command.

- PRE-COLLISION ASSIST WITH AUTOMATIC EMERGENCY BRAKING
- BLIS® (BLIND SPOT INFORMATION SYSTEM) WITH CROSS-TRAFFIC ALERT²
- LANE-KEEPING SYSTEM
- AUTO HIGH-BEAM HEADLAMPS
- REAR VIEW CAMERA

---

[5] *See id.* at 7.

29.     Ford also markets the power and reliability of the Expedition and its engine, saying, "The 2021 Ford Expedition doesn't just get you there, it gets you here, there and virtually everywhere you want to go thanks to the power of its EcoBoost engine and up to 400 horsepower and 480 lb.-ft. of torque, and "delivers consistent engine power for a great drive every time."[6]

> The 2021 Ford Expedition® doesn't just get you there, it gets you here, there and virtually everywhere you want to go thanks to the power of its EcoBoost® engine and up to 400 horsepower[1] and 480 lb.-ft. of torque.[1] A 10-speed automatic transmission with SelectShift® capability helps maximize power, while the available Terrain Management System™ allows you to choose from 7 preset drive modes – easily selected with a simple turn of a dial – to help optimize driving dynamics to the road conditions. Choose Expedition MAX with a 27.8-gallon fuel capacity, and you'll see how getting places in Expedition just got easier.

> **3.5L ECOBOOST V6**
> With 375 max. horsepower[1] and 470 max. lb.-ft. of torque,[1] this twin-turbocharged, port- and direct-fuel-injected engine delivers big acceleration. The wide 7.4:1 gear ratio span of the 10-speed transmission helps smooth out gear shifts and delivers consistent engine power for a great drive every time.

30.     In the sales brochure for the 2021 Lincoln Navigator, Ford again opens with a focus on the vehicle's suitability and function for families, including photos of children with the vehicle, and saying, "Whatever adventures the day holds for you and your family, the 2021 Lincoln Navigator makes sure they start with a warm embrace" and "Celebrate all of life's travels together in Navigator."[7] Ford markets the Navigator as family-friendly because it knows this attribute is and was material to Plaintiffs and putative class members.

---

[6] *See id.* at 8.
[7] *See* **Exhibit 2**, MY 2021 Lincoln Navigator brochure at 2.

**Always begin on a bright note.**
Whatever adventures the day holds for you and your family, the 2021 Lincoln Navigator makes sure they start with a warm embrace. As you approach, Navigator awakens with a graceful greeting. Dynamic signature lighting flows outward beneath the headlamps, while the available illuminated Lincoln Star on the grille glows from within. Power-deployable running boards, backlit door handles and luminous welcome mats invite everyone inside. Brighten your evening journeys with available illumination for the first 2 rows of safety belt buckles. Celebrate all of life's travels together in Navigator.

31.     Ford also touts the passenger seat and row sizes, cargo room, and other functional aspects of the Navigator—again, material to and sought after by consumers with children, including Plaintiffs—saying, "From epic road trips to everyday errands, your family deserves the luxurious comfort of Navigator."[8] Plaintiff Sessler leased his Fire Defect Vehicle in large part because of its size and reliability for frequent trips upstate with his family of five.



PAMPER YOUR PASSENGERS

From epic road trips to everyday errands, your family deserves the luxurious comfort of Navigator. Relaxing is easy with ample 2nd-row leg room, plus an available power, panoramic Vista Roof® that offers skyward views. Seat up to 7 with the heated 2nd-row PowerFold® captain's chairs, and your choice of a pass-through to the 3rd row or an available center console. To seat up to 8, select the available 2nd-row PowerFold bench seat, which also features heated outboard positions and a class-exclusive, independently sliding middle seat.

Treat your passengers to the available Lincoln Play™ Rear-Seat Entertainment System featuring 2 vibrant 10" screens. Plus, everyone can take advantage of 6 USB ports, four 12V powerpoints and a 110V/150W AC power outlet for recharging all sorts of devices.

32.     Ford markets the Navigator's towing abilities—another quality important to many families—saying, "Navigator makes it easy to enrich your adventures with family and friends."[9]

---

[8] *See id.* at 4.
[9] *See id.* at 7.

33.     Because safety is material to Plaintiffs and putative class members, Ford tells consumers they can "journey with confidence" in the Navigator due to its "extensive collection of standard and available driver-assist technologies utiliz[ing] a network of sensors and sophisticated cameras to offer you support during many scenarios."[10]

> JOURNEY WITH CONFIDENCE
>
> Our extensive collection of standard and available driver-assist technologies[1] utilizes a network of sensors and sophisticated cameras to offer you support during many scenarios. These advanced features are all aimed at helping you feel confident in the 2021 Lincoln Navigator.

34.     Ford further highlights the Navigator's engine performance and reliability, saying "Navigator also reinforces your calm confidence with best-in-class 450 horsepower and 510 lb.-ft. of torque produced by its Twin-Turbocharged 3.5-liter V6 engine."[11] The Navigator's reliability is material and critical for purchasers and lessees, including Plaintiffs.

---

[10] *See id.* at 5.
[11] *See id.* at 6.

> GLIDE EFFORTLESSLY
>
> Imagine yourself calmly in command – at peace with your surroundings. The standard Adaptive Suspension helps take you there smoothly by isolating the vehicle from road imperfections, while enhanced sound-absorbing materials and Active Noise Control help keep road noise at bay. The result is a relaxing atmosphere conducive to quiet contemplation or pleasant conversation.
>
> Navigator also reinforces your calm confidence with best-in-class 450 horsepower[1] and 510 lb.-ft. of torque[1] produced by its Twin-Turbocharged 3.5-liter V6 engine. The 3.5-liter is mated to a 10-speed SelectShift® automatic transmission designed to adapt in real-time, engaging the right gear at the right time to deliver the performance you seek.

35.     Consumers paid a premium price for the Fire Defect Vehicles. The Manufacturer's Suggested Retail Price ("MSRP") for the 2021 Ford Expedition starts at $51,320 for the XL Fleet base-level trim and goes up to $78,070[12], and the MSRP for the 2021 Lincoln Navigator starts at $78,400 for the base-level trim and goes up to a whopping $103,550.[13]

36.     Plaintiffs and putative class members paid the premium prices commanded by the Fire Defect Vehicles because of these qualities touted by Ford.

---

[12] *See* **Exhibit 3**, *2021 Ford Expedition MSRP and Invoice Price*, EDMUNDS.COM, https://www.edmunds.com/ford/expedition/2021/msrp/ (last visited June 7, 2022).

[13] *See* **Exhibit 4**, *2021 Lincoln Navigator MSRP and Invoice Price*, EDMUNDS.COM, https://www.edmunds.com/lincoln/navigator/2021/msrp/ (last visited June 7, 2022).

**B.**    **Ford's Vehicle Warranties**

37.    Ford's New Vehicle Limited Warranty for the model year 2021 Ford Expedition provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[14] Ford's Powertrain Warranty for the Expedition provides coverage for 5 years/60,000 miles, whichever comes first.[15] On information and belief, this warranty coverage includes defects like the Spontaneous Fire Defect in the Fire Defect Vehicles.

38.    Ford's New Vehicle Limited Warranty for the model year 2021 Lincoln Navigator provides "bumper-to-bumper" coverage for 4 years/50,000 miles, whichever comes first.[16] Ford's powertrain warranty for the Navigator also protects certain components against defects in factory-supplied materials or workmanship for 6 years or 70,000, whichever comes first.[17] On information and belief, this warranty coverage includes defects like the Spontaneous Fire Defect in the Fire Defect Vehicles.

---

[14] *See* **Exhibit 1**, MY 2021 Ford Expedition brochure, at 15.

[15] *See id.*

[16] *See* **Exhibit 5**, Linsay Thomas and Noelle Talmon, *Lincoln's Factory Warranty Largely Equals Its Competitors*, THE DRIVE.COM, https://www.thedrive.com/reviews/29443/lincoln-warranty (last accessed June 7, 2022).

[17] *See id.*

39.     Because the Fire Defect Vehicles are all model year 2021 vehicles sold or leased to putative class members in the fourth quarter of 2020 or later,[18] virtually all Fire Defect Vehicles—if not all of them, including Plaintiffs' vehicles—are still covered under Ford's new vehicle and powertrain warranties.

**C.     The Spontaneous Fire Defect**

40.     As Ford now admits in a May 17, 2022 safety recall notification to the National Highway Traffic Safety Administration ("NHTSA"), a defect exists in the engine compartment of the Fire Defect Vehicles that can cause them to spontaneously burst into flames while in operation, while parked and running, or while parked and off.[19]

41.     Ford further admits that the Fired Defect Vehicles "pose a risk of underhood fire, including while the vehicle is parked and off."[20]

---

[18] *See* **Exhibit 6**, Brett Foote, *2021 Ford Expedition Order and Production Dates Revealed*, FORD AUTHORITY.COM, July 15, 2020, https://fordauthority.com/2020/07/2021-ford-expedition-order-and-production-dates-revealed/ (last accessed June 7, 2022); *see* **Exhibit 7**, Brett Foote, *2021 Lincoln Navigator Order and Production Dates Revealed*, FORD AUTHORITY.COM, July 15, 2020, https://fordauthority.com/2020/07/2021-lincoln-navigator-order-and-production-dates-revealed/ (last accessed June 7, 2022).
[19] *See* **Exhibit 8**, May 18, 2022 NHTSA letter to Ford, https://static.nhtsa.gov/odi/rcl/2022/RCAK-22V346-9658.pdf (last accessed June 7, 2022).
[20] *See* **Exhibit 9**, May 17, 2022 Part 573 Safety Recall Report, https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V346-3365.PDF (last accessed June 7, 2022).

42.    Ford's recall, number 22V-346, affects 32,711 model year 2021 Ford Expeditions and 6,302 model year 2021 Lincoln Navigators all built between December 1, 2020, and April 30, 2021.[21]

43.    As of May 12, 2022, Ford reports sixteen (16) underhood fires in the Fire Defect Vehicles, including one that resulted in a burn injury. Twelve (12) of these fire incidents occurred while the vehicle was parked and off, one (1) occurred while the vehicle was parked and on, and three (3) occurred while driving, with the occupants reporting a burning smell and smoke from the front passenger engine compartment.[22]

44.    Ford admits that sixteen engine compartment fires from a vehicle population of roughly 39,000, all produced in a four-month period, is "***statistically significant***."[23] (Emphasis added.)

45.    Ford notes that fourteen (14) of the fires were in rental vehicles from various companies and locations, which suggests that the Spontaneous Fire Defect may be related to mileage or use, thereby increasing the risk to Plaintiffs and the Class if they continue to use their vehicles. Regardless, Ford has not instructed consumers to stop driving their vehicles.

---

[21] *See id.*

[22] *See* **Exhibit 10**, Chronology of Defect/Noncompliance Determination, https://static.nhtsa.gov/odi/rcl/2022/RMISC-22V346-1971.pdf (last accessed June 7, 2022).

[23] *See id.*

46.     Critically, Ford has yet to identify, or even speculate, as to the root cause of these fires, only noting that the fires originated from the passenger side rear engine compartment vicinity.

47.     Ford also cannot offer any fix or remedy for Plaintiffs and the Class, or even a timeline for a remedy. Rather, it simply instructs them to park their vehicles outside and away from structures while it continues to investigate the defect.

48.     On information and belief, Ford failed to adequately research, design, test, and manufacture the Fire Defect Vehicles before warranting, advertising, promoting, marketing, and selling the Fire Defect Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

49.     On information and belief, Ford knew or should have know the Fire Defect Vehicles contained the Spontaneous Fire Defect and should have warned or disclosed this fact to Plaintiffs and putative class members before selling or leasing the vehicles.

50.     So far, Ford has only recalled the model year 2021 Ford Expedition and Lincoln Navigator, but it continues to sell these and other model years.

51.     Accordingly, Plaintiffs' counsel continues to investigate whether additional model years of the Expedition and Navigator are also plagued with the Spontaneous Fire Defect.

**D.    Ford knew or should have known of the Spontaneous Fire Defect before it disclosed the Defect to Plaintiffs.**

52.    On information and belief, Ford knew or should have known about the Spontaneous Fire Defect before the Fire Defect Vehicles went to market, and it certainly knew well-before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Fire Defect Vehicles; (2) the direct and public reports of fires in sixteen Fire Defect Vehicles; and (3) Ford's own investigation of fires in the Fire Defect Vehicles.

**1.    Ford's durability testing should have uncovered the Spontaneous Fire Defect.**

53.    Ford claims to conduct comprehensive and rigorous testing on all its vehicles, saying "Ford's comprehensive lineup of testing facilities around the world puts vehicles through everything from the extreme, to the everyday, to ensure that only world-class vehicles roll off the production line."[24]

54.    According to Ford, at their facilities across Thailand, India, Australia, the Middle East and China, "Ford vehicles and components are 'shaken, rattled and rolled' in a variety of tests, some conducted in temperatures ranging from an arctic

_____

[24] *See* **Exhibit 11**, *Testing in the Extremes: How Ford's Multiple Testing Facilities Push Vehicles to the Limit*, October 7, 2019, FORD.COM, https://media.ford.com/content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes--how-fords-multiple-testing-facilities-p.html (last accessed June 7, 2022).

minus 40 degrees Celsius, to desert-scorching heat of over 50 degrees Celsius."[25]

These tests include stresses on the engines, moving parts, suspension, and

electrical components.[26]

55.     Ford even puts its vehicles through a Total Durability Cycle,

described by Ford as "sped-up evaluation runs around the clock, day and night, to

simulate 10 years, or 240,000km, of severe customer usage in just a few weeks."[27]

"Gravel roads, cobblestones, pot-holes, curbs and water baths feature in this

grueling test," and "Just for good measure, environmental factors like dust, water

and mud are thrown in, while dynamometers simulate towing heavy loads in traffic

and over mountain passes."[28]

56.     On information and belief, the Fire Defect Vehicles were put through

similar durability testing or designed and built in accordance with the findings of

such durability testing.

57.     Based on such durability testing, Ford should have uncovered the

Spontaneous Fire Defect before the Fire Defect Vehicles were sold to Plaintiffs

and the putative class members.

---

[25] *See id.*

[26] *See id.*

[27] *See id.*

[28] *See id.*

**2.    Ford knew about the Spontaneous Fire Defect from reports of fires in sixteen Fire Defect Vehicles and its own investigation.**

58.    According to its recall chronology, Ford opened an investigation into the fires on March 24, 2022. By that time, Ford reports knowledge of *nine (9) fire reports*, including fires while driving and while parked and off.

59.    Ford's investigation continued up until the May 2022 recall and uncovered *seven (7) more fires* in the Fire Defect Vehicles. Ford's investigation consisted of reviews and site visits with the rental car companies where some of the fires occurred, vehicle inspections, supplier reviews, product design reviews, and field and connection data analyses. Despite this, Ford still has no fix.

60.    Ford did not disclose the dates of the sixteen fires in the Fire Defect Vehicles, but on information and belief, Ford learned of at least some of these fires on or before the March 24, 2022 investigation launch.

61.    All vehicle manufacturers, including Ford, also routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, Ford has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Fire Defect Vehicles. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

62.    Ford also receives complaints directly from consumers and its dealers, and thus, on information and belief, has knowledge of all complaints lodged to it or

its agents regarding the Fire Defect Vehicles and the Spontaneous Fire Defect. At a minimum, Ford received complaints from terrified and angry owners and lessees such as Plaintiffs Sessler and Smith after learning about the Spontaneous Fire Defect.

63.     However, Ford is not yet offering any remedy for the Defect. Instead, Ford advises the hapless Fire Defect Vehicle owners and lessees to park them away from their homes and other property. Ford does not explain what constitutes a safe distance from a vehicle that spontaneously burst into flames, or what owners should do with their vehicles if they have no such place to park them, or what owners who rely on these vehicles to transport their families daily can do to avoid a fire while driving. And Ford is not globally offering to buy back the vehicles or even provide loaner or rental vehicles until it can fix the problem.

64.     Faced with this Hobson's choice foisted upon them by Ford, owners and lessees of the Fire Defect Vehicles predictably and reasonably have made a variety of choices. Some can comply with Ford's instructions and have distant parking spaces they can access at great inconvenience and risk to their vehicles and family of parking in distant and/or unsafe locations. Many, like Plaintiff Smith, are simply unable to find a "safe" place to park their Fire Defect Vehicles at home, work, and/or anywhere else they need to take their vehicles and have no choice but

to park them in unsafe locations. Others have elected to limit or cease their use of the vehicle altogether.

65.     On information and belief, some owners—justified in their unwillingness to play Russian roulette with their vehicles—are selling or trading them in at greatly reduced prices because of Ford's conduct.

66.     All owners and lessees of the Fire Defect Vehicles have suffered ascertainable loss.

**E.     There is an agency relationship between Ford and Ford dealerships.**

67.     On information and belief, the manufacturer Ford has impliedly or expressly acknowledged that Ford-authorized dealerships are its sales agents, the dealers have accepted that undertaking, Ford can control authorized Ford dealers, and Ford acts as the principal in that relationship, as is shown by the following:

i.     Ford can terminate the relationship with its dealers at will.

ii.     The relationships are indefinite.

iii.     Ford is in the business of selling vehicles as are its dealers.

iv.     Ford provides tools and resources to help Ford dealers sell vehicles.

v.     Ford supervises its dealers regularly.

vi.     Without Ford, the relevant Ford dealers would not exist.

vii.     Ford requires the following of its dealers.

1.    Reporting of sales;

2.    Computer network connection with Ford;

3.    Training of dealers' sales and technical personnel;

4.    Use of Ford-supplied computer software;

5.    Participation in Ford's training programs;

6.    Establishment and maintenance of service departments in Ford dealerships;

7.    Certification of Ford pre-owned vehicles;

8.    Reporting to Ford with respect to the car delivery, including reporting Plaintiffs' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

9.    Displaying Ford logos on signs, literature, products, and brochures within Ford dealerships.

viii.   Dealerships bind Ford with respect to:

1.    Warranty repairs on the vehicles the dealers sell; and

2.    Issuing service contracts administered by Ford.

ix.   Ford further exercises control over its dealers with respect to:

1.    Financial incentives given to Ford dealer employees;

2.    Locations of dealers;

3.    Testing and certification of dealership personnel to ensure compliance with Ford's policies and procedures; and

4.      Customer satisfaction surveys, pursuant to which Ford allocates the number of Ford cars to each dealer, thereby directly controlling dealership profits.

x.      Ford dealers sell Ford vehicles on Ford's behalf, pursuant to a "floor plan," and Ford does not receive payment for its cars until the dealerships sell them.

xi.     Dealerships bear Ford's brand names, use Ford's logos in advertising and on warranty repair orders, post Ford- and Lincoln-branded signs for the public to see, and enjoy a franchise to sell Ford's products, including the Fire Defect Vehicles.

xii.    Ford requires Ford dealers to follow the rules and policies of Ford in conducting all aspects of dealer business, including the delivery of Ford's warranties described herein, and the servicing of defective vehicles such as the Fire Defect Vehicles.

xiii.   Ford requires its dealers to post Ford's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized Ford dealers and servicing outlets for Ford cars.

xiv.    Ford requires its dealers to use service and repair forms containing Ford's brand names and logos.

xv.     Ford requires Ford dealers to perform Ford's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Ford.

xvi.    Ford requires Ford and Lincoln dealers to use parts and tools either provided by Ford, or approved by Ford, and to inform Ford when dealers discover that unauthorized parts have been installed on one of Ford's vehicles.

xvii.   Ford requires dealers' service and repair employees to be trained by Ford in the methods of repair of Ford. and Lincoln-branded vehicles.

xviii.  Ford audits Ford dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix.  Ford requires its dealers to provide Ford with monthly statements and records pertaining, in part, to dealers' sales and servicing of Ford vehicles.

xx.  Ford provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xxi.  Ford provides its dealers with specially trained service and repair consultants with whom dealers are required by Ford to consult when dealers are unable to correct a vehicle defect on their own.

xxii.  Ford requires Ford and Lincoln vehicle owners to go to authorized Ford and Lincoln dealers to obtain servicing under Ford warranties.

xxiii.  Ford dealers are required to notify Ford whenever a car is sold or put into warranty service.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Discovery Rule Tolling

68.   Because Ford omitted the existence of the Spontaneous Fire Defect, Class members had no way of knowing about the unreasonable fire risk of the Fire Defect Vehicles.

69.   Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Classes could not have discovered through the

exercise of reasonable diligence that Ford was omitting the Defect complained of herein.

70.     Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Ford had omitted information about the unreasonable fire risk of the Fire Defect Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

71.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Fire Defect Vehicles.

**B.     Estoppel**

72.     Ford was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the fire risk of the Fire Defect Vehicles.

73.     Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fire risk of the Fire Defect Vehicles.

74.     Based on the foregoing, Ford is estopped from relying on any statutes

of limitations in defense of this action.

### VII.   CLASS ALLEGATIONS

75.     Plaintiffs bring this action on behalf of themselves and as a class

action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of

Civil Procedure, on behalf of the following class and subclasses:

> **Nationwide Class**: All persons or entities who purchased
> or leased model year 2021 Ford Expedition or Lincoln
> Navigator vehicles (the "Fire Defect Vehicles").
>
> **Florida Subclass**: All persons or entities who purchased or
> leased one or more of the Fire Defect Vehicles in the State of
> Florida.
>
> **New York Subclass**: All persons or entities who purchased or
> leased one or more of the Fire Defect Vehicles in the State of
> New York.
>
> **North Carolina Subclass**: All persons or entities who
> purchased or leased one or more of the Fire Defect Vehicles in
> the State of North Carolina.

76.     Plaintiffs assert claims under the laws of each state set forth below.

77.     Excluded from the definitions of each Class and Subclass are any

personal injury or property damages claims resulting from the fires or explosions

caused by the Fire Defect Vehicles. Also excluded from the Class and Subclasses

are Ford and its subsidiaries and affiliates; all persons who make a timely election

to be excluded from this action; governmental entities; the Judge to whom this case

is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

78.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

79.     This action has been brought and may be properly maintained on behalf of the Classes and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

80.     **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of each Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be 39,013 or more Fire Defect Vehicles in the Nationwide Class. The precise number of Class and Subclass members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class and Subclass members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and published notice.

81.   **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass members, including, without limitation:

    a.    Whether Ford engaged in the conduct alleged herein;

    b.    Whether the Spontaneous Fire Defect creates an unreasonable risk of fires in the Fire Defect Vehicles;

    c.    When Ford first knew about the Spontaneous Fire Defect;

    d.    Whether Ford designed, manufactured, marketed, and distributed the Fire Defect Vehicles with defective component(s) that cause underhood fire;

    e.    Whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

    f.    Whether Ford has been unjustly enriched at the expense of Plaintiffs and the Class and Subclasses;

    g.    Whether Plaintiffs and the other Class and Subclass members overpaid for their vehicles at the point of sale; and

    h.    Whether Plaintiffs and the other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

82.   **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass members' claims because, among other things, all Class and Subclass members were comparably injured through Ford's wrongful conduct as described above.

83.    **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class and Subclass representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

84.    **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for Ford's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management

difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CLAIMS

**A.    Nationwide Claims**

### COUNT I

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, *et seq*.)**

**(Alleged by all Plaintiffs on behalf of the Nationwide Class)**

85.     Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

86.     Plaintiffs bring this claim on behalf of the Nationwide Class.

87.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

88.     The Fire Defect Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

89.     Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

90.     15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

91.     Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Fire Defect Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

92.     Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiffs under 15 U.S.C. § 2310(d)(1). Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a defect in the engine compartment that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Defect rendered the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing when not in use) when they were sold or leased, and at

- 36 -

all times thereafter. In fact, because of the Spontaneous Fire Defect, Ford specifically advised owners and lessees to park their vehicles outside and away from structures.

93.    As discussed herein, on information and belief, Ford knew or should have known about the Spontaneous Fire Defect from its own durability testing of the Fire Defect Vehicles before launching the Fire Defect Vehicles. Ford omitted information about the Defect and its consequences from Plaintiffs and Class members, misrepresented the qualities of the Fire Defect Vehicles, and has failed to provide a fix for the Defect.

94.    Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Fire Defect Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

95.    Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs, because, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

96.    Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew or should have known that the Fire Defect Vehicles were defective and that the Fire Defect Vehicles could spontaneously ignite when used as intended long before Plaintiffs and the Class.

Ford failed to disclose this defect to Plaintiffs and the Class. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

97.     Plaintiffs have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Fire Defect Vehicles and have no rights under the warranty agreements provided with the Fire Defect Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Fire Defect Vehicles are dangerous instrumentalities due to the aforementioned defect, as spontaneous fires present an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders.

98.     Under 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs under Rule 23 of the Federal Rules of Civil Procedure.

99.    Plaintiffs would suffer economic hardship if they returned their Fire Defect Vehicles but did not receive the return of all payments made by them. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Fire Defect Vehicles by retaining them.

100.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class members in connection with the commencement and prosecution of this action.

101.    Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Spontaneous Fire Defect in their Fire Defect Vehicles.

## COUNT II

**UNJUST ENRICHMENT
(COMMON LAW)**

**(Alleged by all Plaintiffs on behalf of the Nationwide Class)**

102.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

103.   Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the state-specific Subclasses. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all the states.

104.   This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class.

105.   Ford has received and retained a benefit from Plaintiffs and Nationwide Class members and inequity has resulted.

106.   Ford has benefitted from selling, leasing, and distributing the Fire Defect Vehicles for more than they were worth because of Ford's conduct described herein, at a profit, and Plaintiffs and Nationwide Subclass members have overpaid for the Fire Defect Vehicles and been forced to pay other costs.

107.   Thus, Plaintiffs and the Nationwide Subclass conferred a benefit on Ford.

108.   It is inequitable for Ford to retain these benefits.

109.    Plaintiffs and the Nationwide Subclass were not aware of the true facts about the Fire Defect Vehicles and did not benefit from Ford's conduct described herein.

110.    Ford knowingly accepted the benefits of its unjust conduct.

111.    As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**B.    State-Specific Claims**

**COUNT III**

**VIOLATION OF FLORIDA'S UNFAIR &
DECEPTIVE TRADE PRACTICES ACT
(FLA. STAT. § 501.201, *ET SEQ.*)**

**(Alleged by Plaintiff Stahlman on behalf of the Florida Subclass)**

112.    Plaintiff Stahlman and the Florida Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

113.    Plaintiff Stahlman brings this claim on behalf of herself and the Florida Subclass.

114.    Plaintiff Stahlman and the Florida Subclass members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), FLA. STAT. § 501.203(7).

115.    Ford engaged in "trade or commerce" within the meaning of FLA. STAT. § 501.203(8).

116.   The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1).

117.   By omitting the Spontaneous Fire Defect and misleading Plaintiff Stahlman and the Florida Subclass about the Fire Defect Vehicles, Ford participated in unfair and deceptive trade acts or practices that violated the FUDTPA, as described herein.

118.   In the course of its business, Ford violated the FUDTPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Stahlman and the Florida Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

119.   Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiff Stahlman and the Florida Subclass.

120.   By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe

for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the FUDTPA.

121.  The Spontaneous Fire Defect would be material to a reasonable consumer, such as the Florida Subclass, and is material to Plaintiff Stahlman.

122.  Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Stahlman and the Florida Subclass, and did in fact deceive and mislead Plaintiff Stahlman.

123.  Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiff Stahlman and the Florida Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Stahlman and the Florida Subclass, and did in fact deceive and mislead Plaintiff Stahlman.

124.  Plaintiff Stahlman could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

125.   Ford knew or should have known that its conduct violated the
FUDTPA.

126.   Ford knew or should have known about the Spontaneous Fire Defect
affecting the Fire Defect Vehicles owned or leased by Plaintiff Stahlman and the
Florida Subclass members based on (i) its own pre-sale durability testing; (ii) the
direct and public reports of fires in sixteen Fire Defect Vehicles; and (iii) Ford's
own investigation of fires in the Fire Defect Vehicles.

127.   As alleged herein, Ford made material statements about the safety,
functionality, quality, and reliability of the Fire Defect Vehicles that were either
false or misleading.

128.   Ford owed Plaintiff Stahlman and the Florida Subclass a duty to
disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a.    Possessed exclusive knowledge about the Spontaneous Fire
        Defect;

b.    Omitted the foregoing from Plaintiff Stahlman and the Florida
        Subclass;

c.    Made misleading and incomplete representations about the
        safety, quality, functionality, and reliability of the Fire Defect
        Vehicles, while withholding material facts from Plaintiff
        Stahlman and the Florida Subclass that contradicted these
        representations; and/or

d.    Had duties under the TREAD Act and related regulations to
        disclose and remedy the defect.

129.   Because Ford omitted the Spontaneous Fire Defect, Plaintiff Stahlman and the Florida Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiff Stahlman and the Florida Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

130.   Ford's violations of the FUDTPA present a continuing risk to Plaintiff Stahlman, the Florida Subclass, and the public. In particular and as alleged herein, Ford has yet to provide a fix for the Spontaneous Fire Defect, or even a timeline for a fix. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

131.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Stahlman and the Florida Subclass. Had Plaintiff Stahlman and the Florida Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for

them. Plaintiff Stahlman and the Florida Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

132.   Because Ford's deceptive acts and practices caused injury to Plaintiff Stahlman and the Florida Subclass, they seek and are entitled to recover their actual damages under FLA. STAT. § 501.211(2) and attorneys' fees under FLA. STAT. § 501.2105(1). Plaintiff Stahlman and the Florida Subclass also seek an order enjoining Ford's unfair, unlawful, and deceptive practices, declaratory relief, costs, and any other just and proper relief available under the FUDTPA.

## COUNT IV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER FLORIDA LAW (Fla. Stat. § 672.314)

**(Alleged by Plaintiff Stahlman on behalf of the Florida Subclass)**

133.   Plaintiff Stahlman and the Florida Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

134.   Plaintiff Stahlman brings this claim on behalf of herself and the Florida Subclass.

135.   Ford is a "merchant" within the meaning of FLA. STAT. § 672.104, and a "seller" of motor vehicles within the meaning of FLA. STAT. § 672.103(d).

136.    Under Florida law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. *See* FLA. STAT. § 672.314.

137.    The Fire Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

138.    Plaintiff Stahlman and the Florida Subclass members were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff Stahlman and the Florida Subclass members. *See* FLA. STAT. § 672.318.

139.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Stahlman and the Florida Subclass have been damaged in an amount to be determined at trial.

## COUNT V

### VIOLATION OF NEW YORK'S DECEPTIVE ACTS AND PRACTICES
### (N.Y. Gen. Bus. Law § 349, *ET SEQ.*)

(Alleged by Plaintiff Sessler on behalf of the New York Subclass)

140.   Plaintiff Sessler and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

141.   Plaintiff Sessler brings this action on behalf of himself and the New York Subclass.

142.   Plaintiff Sessler and the New York Subclass members are "persons" within the meaning of New York General Business Law ("NYGBL"), N.Y. Gen. Bus. Law § 349(h).

143.   Ford is a "person," "firm," "corporation," or "association" within the meaning of NYGBL Section 349.

144.   NYGBL Section 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce, or in the furnishing of any service in this state ..." Material omissions are also actionable under NYGBL § 349.

145.   By omitting the Spontaneous Fire Defect and misleading Plaintiff Sessler and the New York Subclass about the Fire Defect Vehicles, Ford's conduct described herein constitutes "deceptive acts or practices" within the meaning of the NYGBL.

146.   In the course of its business, Ford violated NYGBL Section 349 and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Sessler and the New York Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

147.   Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiff Sessler and the New York Subclass.

148.   Ford knew or should have known that its conduct violated the NYGBL.

149.   Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Sessler and the New York Subclass members based on (i) its own pre-sale durability testing;

(ii) the direct and public reports of fires in sixteen Fire Defect Vehicles; and

(iii) Ford's own investigation of fires in the Fire Defect Vehicles.

150.   The Spontaneous Fire Defect would be material to a reasonable consumer, such as the New York Subclass, and is material to Plaintiff Sessler.

151.   Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Sessler and the New York Subclass, and did in fact deceive and mislead Plaintiff Sessler.

152.   Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiff Sessler and the New York Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Sessler and the New York Subclass, and did in fact deceive and mislead Plaintiff Sessler.

153.   Plaintiff Sessler could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

154.   As alleged above, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

155.   Ford owed Plaintiff Sessler and the New York Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

    a.    Possessed exclusive knowledge about the Spontaneous Fire Defect;

    b.    Omitted the foregoing from Plaintiff Sessler and the New York Subclass;

    c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Sessler and the New York Subclass that contradicted these representations; and/or

    d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defect.

156.   Because Ford omitted the Spontaneous Fire Defect, Plaintiff Sessler and the New York Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiff Sessler and the New York Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

157.   Ford's violations of the NYGBL present a continuing risk to Plaintiff Sessler, the New York Subclass, and the public. In particular and as alleged herein, Ford has yet to provide a fix for the Spontaneous Fire Defect, or even a timeline for a fix. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

158.   Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Sessler and the New York Subclass. Had Plaintiff Sessler and the New York Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Sessler and the New York Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

159.   Because Ford's deceptive acts and practices caused injury to Plaintiff Sessler and the New York Subclass, they seek monetary relief against Ford in the greater amount of actual damages or statutory damages, and reasonable attorneys' fees and costs. Plaintiff Sessler and the New York Subclass also seek an order

enjoining Ford's unlawful practices and any other just and proper relief available under NYGBL Section 349.

## COUNT VI

### VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT (N.Y. GEN. BUS. LAW § 350)

**(Alleged by Plaintiff Sessler on behalf of the New York Subclass)**

160.   Plaintiff Sessler and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

161.   Plaintiff Sessler brings this action on behalf of himself and the New York Subclass.

162.   Ford was and is engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. GEN. BUS. LAW § 350.

163.   New York's General Business Law ("NYGBL") Section 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity. . . ." N.Y. GEN. BUS. LAW § 350-a.

164.   Ford caused to be made or disseminated through New York, through representations, marketing, and other publications, statements that were untrue or

misleading, and which were known, or which by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff Sessler and the New York Subclass members.

165.   Ford violated NYGBL Section 350 because it omitted facts regarding the Spontaneous Fire Defect and misrepresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles to Plaintiff Sessler and New York Subclass members, as alleged herein, which were material omissions and misrepresentations and likely to deceive a reasonable consumer, such as Plaintiff Sessler and New York Subclass members.

166.   Plaintiff Sessler and the New York Subclass suffered injury, including the loss of money or property, because of Ford's false advertising. In purchasing or leasing their Fire Defect Vehicles, Plaintiff Sessler and the New York Subclass members relied on Ford's misrepresentations and omissions regarding the safety, quality, functionality, and reliability of the Fire Defect Vehicles. Had Plaintiff Sessler and the New York Subclass members known about the Spontaneous Fire Defect, they would not have purchased or leased their Fire Defect Vehicles or paid as much for them. Plaintiff Sessler and the New York Subclass also suffered ascertainable monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

167.    Under NYGBL Section 350, Plaintiff Sessler and the New York

Subclass seek monetary relief against Ford in the greater amount of actual damages

or statutory damages. Plaintiff Sessler and the New York Subclass also seek an

order enjoining Ford's unlawful practices, attorneys' fees, costs, and any other just

and proper relief available under NYGBL Section 350.

<u>**COUNT VII**</u>

**BREACH OF NEW YORK'S IMPLIED WARRANTY OF
MERCHANTABILITY (N.Y. U.C.C. LAW §§ 2-314; 2A-212)**

**(Alleged by Plaintiff Sessler on behalf of the New York Subclass)**

168.    Plaintiff Sessler and the New York Subclass reallege and incorporate

by reference all paragraphs as though fully set forth herein.

169.    Plaintiff Sessler brings this action on behalf of himself and the New

York Subclass.

170.    Ford is a "merchant[]" and "seller[]" of motor vehicles, and the Fire

Defect Vehicles are "goods" under New York law. *See* N.Y. U.C.C. § 2-104(1).

171.    Under N.Y. U.C.C. §§ 2-314; 2A-212, an implied warranty of

merchantability attaches to the Fire Defect Vehicles when they were sold or leased

by Ford to Plaintiff Sessler and the New York Subclass members.

172.    The Fire Defect Vehicles were not merchantable when sold or leased

because they are prone to a spontaneous and unreasonable risk of fire due to the

Spontaneous Fire Defect described herein. Without limitation, the Fire Defect

Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

173.   Plaintiff Sessler and the New York Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff Sessler and the New York Subclass members.

174.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Sessler and the New York Subclass have been damaged in an amount to be determined at trial.

## COUNT VIII

**VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN. STAT. § 75-1.1, *ET SEQ.*)**

**(Alleged by Plaintiff Smith on behalf of the North Carolina Subclass)**

175.   Plaintiff Smith and the North Carolina Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

176.   Plaintiff Smith brings this action on behalf of himself and the North Carolina Subclass.

177.   Ford engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

178.   N.C. GEN. STAT. § 75-1.1, *et seq.* (the "North Carolina Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." As alleged herein, Ford committed unfair or deceptive acts or practices in violation of the North Carolina Act.

179.   In the course of its business, Ford violated the North Carolina Act and engaged in unfair and deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Smith and the North Carolina Subclass members. Ford also mispresented the safety, quality, functionality, and reliability

of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

180.   Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiff Smith and the North Carolina Subclass.

181.   By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the North Carolina Act.

182.   The Spontaneous Fire Defect would be material to a reasonable consumer, such as the North Carolina Subclass, and is material to Plaintiff Smith.

183.   Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Smith and the North Carolina Subclass, and did in fact deceive and mislead Plaintiff Smith.

184.   Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiff Smith and the North Carolina Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire

Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Smith and the North Carolina Subclass, and did in fact deceive and mislead Plaintiff Smith.

185.   Plaintiff Smith could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

186.   Ford knew or should have known that its conduct violated the North Carolina Act.

187.   Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Smith and the North Carolina Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in sixteen Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

188.   As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

189.   Ford owed Plaintiff Smith and the North Carolina Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

      a.    Possessed exclusive knowledge about the Spontaneous Fire Defect;

     b.    Omitted the foregoing from Plaintiff Smith and the North Carolina Subclass;

     c.    Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Smith and the North Carolina Subclass that contradicted these representations; and/or

     d.    Had duties under the TREAD Act and related regulations to disclose and remedy the defect.

190.   Because Ford omitted the Spontaneous Fire Defect, Plaintiff Smith and the North Carolina Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiff Smith and the North Carolina Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

191.   Ford's violations of the North Carolina Act present a continuing risk to Plaintiff Smith, the North Carolina Subclass, and the public. In particular and as alleged herein, Ford has yet to provide a fix for the Spontaneous Fire Defect, or even a timeline for a fix. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

192. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Smith and the North Carolina Subclass. Had Plaintiff Smith and the North Carolina Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Smith and the North Carolina Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

193. Because Ford's deceptive acts and practices caused injury to Plaintiff Smith and the North Carolina Subclass, they seek an order for treble their actual damages, an order enjoining Ford's unlawful acts, costs, attorney's fees, and any other just and proper relief available under the North Carolina Act.

## COUNT IX

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.C. GEN. STAT. § 25-2-314)

**(Alleged by Plaintiff Smith on behalf of the North Carolina Subclass)**

194. Plaintiff Smith and the North Carolina Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

195. Plaintiff Smith brings this action on behalf of himself and the North Carolina Subclass.

196.   Ford is a merchant with respect to motor vehicles within the meaning of N.C. Gen. Stat. § 25-2-104(1).

197.   Under N.C. Gen. Stat. § 25-2-314, a warranty that the Fire Defect Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff Smith and the North Carolina Subclass purchased or leased their Fire Defect Vehicles from Ford.

198.   The Fire Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

199.   Plaintiff Smith and the North Carolina Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff Smith and the North Carolina Subclass members.

200.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Smith and the North Carolina Subclass have been damaged in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against Ford, as follows:

A.   Certification of the proposed Nationwide and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B.   Restitution, including at the election of Class and Subclass members, recovery of the purchase price of their Fire Defect Vehicles, or the overpayment for their vehicles;

C.   Damages, costs, and disgorgement in an amount to be determined at trial;

D.   An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

E.     An award of costs and attorneys' fees; and

F.     Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.


DATED: June 7, 2022                    Respectfully Submitted,

                                       */s/ Steve W. Berman*
                                       Steve W. Berman
                                       Thomas E. Loeser
                                       **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                       1301 Second Avenue, Suite 2000
                                       Seattle, WA 98101
                                       Telephone: (206) 623-7292
                                       Facsimile: (206) 623-0594
                                       steve@hbsslaw.com
                                       toml@hbsslaw.com

                                       Rachel E. Fitzpatrick
                                       **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                       11 West Jefferson Street, Suite 1000
                                       Phoenix, Arizona 85003
                                       Telephone: (602) 840-5900
                                       Facsimile: (602) 840-3012
                                       rachelf@hbsslaw.com

                                       E. Powell Miller (P39487)
                                       Sharon S. Almonrode (P33938)
                                       Dennis A. Lienhardt (P81118)
                                       **THE MILLER LAW FIRM PC**
                                       950 W. University Drive, Suite 300
                                       Rochester, MI 48307
                                       Telephone: (248) 841-2200
                                       epm@millerlawpc.com
                                       ssa@millerlawpc.com
                                       dal@millerlawpc.com

                                       *Attorneys for Plaintiffs*