UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

JESSICA STAHLMAN, LEWIS HAMPTON, JEFF SWANSON, SCOTT BARBER, ANTHONY CAITO, MIRANDA HANLEY, WILLIAM A. HEAD III, CLIFFORD MASON, RICHARD REZKO, MICHAEL MEHLING, KATHLEEN HOLM, KELLY ERNEST, NANCY MAMMEL, JEREMY SESSLER, RONALD SMITH, KUYA MACHANJA, LISA KUHN, PAUL RICH, AMBER SULLIGAN, JORGE ROMO, JULIE HUNTLEY, and MANUEL AMORES, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

FORD MOTOR COMPANY, a Delaware Limited Liability Company,

Defendant.

Case No. 4:22-cv-11244-SDK-DRG

Hon. Shalina D. Kumar
Mag. Judge David R. Grand

**JURY TRIAL DEMANDED**

**FIRST AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1

II. JURISDICTION .......... 8

III. VENUE .......... 9

IV. PARTIES .......... 9

A. Plaintiffs .......... 9

1. Lewis Hampton (California) .......... 9
2. Jeff Swanson (Colorado) .......... 10
3. Scott Barber (Connecticut) .......... 12
4. Anthony Caito (Florida) .......... 13
5. Jessica Stahlman (Florida) .......... 14
6. Miranda Hanley (Georgia) .......... 16
7. William A. Head, III (Georgia) .......... 17
8. Clifford ("Greg") Mason (Illinois) .......... 19
9. Richard Rezko (Illinois) .......... 20
10. Michael Mehling (Michigan) .......... 21
11. Kathleen Holm (Montana) .......... 22
12. Kelly Ernest (Montana) .......... 24
13. Nancy Mammel (New Mexico) .......... 25
14. Jeremy Sessler (New York) .......... 26
15. Ronald ("RJ") Smith (North Carolina) .......... 27
16. Kuya Machanja (Ohio) .......... 28

17. Lisa Kuhn (Oklahoma) .......... 29

18. Paul Rich (Oregon) .......... 31

19. Amber Sulligan (Pennsylvania) .......... 35

20. Jorge Romo (Texas) .......... 36

21. Julie Huntley (Texas) .......... 37

22. Manuel Amores (Texas) .......... 38

B. Defendant .......... 40

V. FACTUAL ALLEGATIONS .......... 41

A. Ford marketed the Fire Defect Vehicles as family-friendly, functional, safe, and reliable, and knew these attributes were material to consumers. .......... 41

B. Ford's Vehicle Warranties .......... 48

C. The Spontaneous Fire Defect .......... 49

D. Ford knew or should have known of the Spontaneous Fire Defect before it disclosed the defect to Plaintiffs. .......... 52

1. Ford's durability testing should have uncovered the Spontaneous Fire Defect. .......... 53

2. Ford knew about the Spontaneous Fire Defect from reports of fires in 21 Fire Defect Vehicles and its own investigation. .......... 54

E. There is an agency relationship between Ford and Ford dealerships. .......... 57

VI. TOLLING OF THE STATUTE OF LIMITATIONS .......... 60

A. Discovery Rule Tolling .......... 60

B. Estoppel .......... 61

VII. CLASS ALLEGATIONS .......... 61

VIII. CLAIMS .......... 67

A. Nationwide Claims .......... 67

COUNT I VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*) .......... 67

COUNT II UNJUST ENRICHMENT (COMMON LAW) .......... 72

B. State-Specific Claims .......... 73

1. California .......... 73

COUNT III VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, et seq.) .......... 73

COUNT IV VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200) .......... 77

COUNT V VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500, et seq.) .......... 79

COUNT VI VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1 & 1792) .......... 82

2. Colorado .......... 85

COUNT VII VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT (Col. Rev. Stat. § 6-1-101, *et seq.*) .......... 85

COUNT VIII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER COLORADO LAW (Col. Rev. Stat. § 4-2-314) .......... 91

3. Connecticut .......... 93

COUNT IX VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT (Conn. Gen. Stat. § 42-110a, *et seq.*) .......... 93

COUNT X BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CONNECTICUT LAW (Conn. Gen. Stat. § 42a-2-314) .......... 98

4. Florida ........................................ 100

COUNT XI VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.201, *et seq.*) ........ 100

COUNT XII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER FLORIDA LAW (Fla. Stat. § 672.314) ........ 105

5. Georgia ........................................ 106

COUNT XIII VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT (Ga. Code Ann. § 10-1-390, *et seq.*) ........ 106

COUNT XIV VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT (Ga. Code Ann. § 10-1-370, *et seq.*) ........ 111

COUNT XV BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER GEORGIA LAW (Ga. Code Ann. § 11-2-314(1)) ........ 116

6. Illinois ........................................ 118

COUNT XVI VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (810 ILCS 505/1, *et seq.*, and 720 ILCS 295/1A) ........ 118

COUNT XVII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER ILLINOIS LAW (810 ILCS 5/2-314) ........ 123

7. Michigan ........................................ 124

COUNT XVIII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MICHIGAN LAW (Mich. Comp. Laws § 440.314) ........ 124

8. Montana ........................................ 126

COUNT XIX VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (Mont. Code Ann. § 30-14-101, *et seq.*) ........ 126

COUNT XX BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Mont. Code Ann. § 30-2-314) .......................... 131

9. New Mexico .................................................................... 133

COUNT XXI VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT (N.M. Stat. Ann. §§ 57-12-1, *et seq.*) ........................ 133

COUNT XXII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.M. Stat. Ann. § 55-2-314)............................ 138

10. New York ........................................................................ 141

COUNT XXIII VIOLATION OF NEW YORK'S DECEPTIVE ACTS AND PRACTICES (N.Y. Gen. Bus. Law § 349, *et seq.*) ......................... 141

COUNT XXIV VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT (N.Y. Gen. Bus. Law § 350)................................ 146

COUNT XXV BREACH OF NEW YORK'S IMPLIED WARRANTY OF MERCHANTABILITY (N.Y. U.C.C. Law §§ 2-314; 2A-212)......... 148

11. North Carolina.................................................................. 150

COUNT XXVI VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. Gen. Stat. § 75-1.1, *et seq.*) ..................................................................... 150

COUNT XXVII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.C. Gen. Stat. § 25-2-314).............................. 154

12. Ohio ................................................................................. 156

COUNT XXVIII VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT (Ohio Rev. Code § 1345.01, *et seq.*)......................... 156

COUNT XXIX IMPLIED WARRANTY IN TORT UNDER OHIO LAW ........................................................................................ 163

13. Oklahoma ........................................................................ 165

COUNT XXX VIOLATION OF OKLAHOMA'S CONSUMER PROTECTION ACT (Okla. Stat. Tit. 15 § 751, *et seq.*).......................... 165

COUNT XXXI BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Okla. Stat. Tit. 12A §§ 2-314 and 2A-212) ........ 169

14. Oregon ........ 171

COUNT XXXII VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT (Or. Rev. Stat. §§ 646.605, *et seq.*) ........ 171

COUNT XXXIII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER OREGON LAW (Or. Rev. Stat. §72.3140) ........ 177

15. Pennsylvania ........ 179

COUNT XXXIV VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, *et seq.*) ........ 179

COUNT XXXV BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER PENNSYLVANIA LAW (13 Pa. Cons. Stat. Ann. § 2314) ........ 183

16. Texas ........ 186

COUNT XXXVI VIOLATION OF TEXAS'S DECEPTIVE TRADE PRACTICES ACT (Tex. Bus. & Com. Code §§ 17.41, *et seq.*) ........ 186

COUNT XXXVII BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Tex. Bus. & Com. Code § 2.314) ........ 191

REQUEST FOR RELIEF ........ 193

DEMAND FOR JURY TRIAL ........ 193

Plaintiffs file this lawsuit individually and on behalf of proposed nationwide and statewide classes. Plaintiffs allege the following based on personal knowledge as to their own acts and experiences and, as to all other matters, based on the investigation of counsel:

## I. INTRODUCTION

1. The most important duty of a car manufacturer is to provide consumers with a safe car. A second related duty is to promptly warn consumers and fix or replace a car where the manufacturer learns of a defect that implicates serious safety issues. And when a car cannot be safely used by its owner while a car manufacturer is developing a fix for a safety defect, the car manufacturer should not shift the risk of a dangerous fire event on to the owner, but instead should provide or reimburse for comparable replacement transportation.

2. Ford Motor Company ("Ford") breached these fundamental duties by selling Ford Expeditions and Lincoln Navigators that were dangerously defective and prone to catching fire, including while driving, while parked but on, and while parked and off. Then, though Ford knew or should have known of the fire risk prior to launching the vehicles, it did nothing to promptly warn the vast majority of owners and lessees, instead waiting months to announce a safety recall, and then waiting months more before expanding the recall to cover even more affected vehicles. And while Ford now claims to have identified and designed a fix for the

manufacturing defect that is causing these vehicles to spontaneously combust, it admits that the fix is at least several months away for a substantial majority of affected vehicles. Now, even though Ford has admitted that the manufacturing defect creates a risk of fire in parked and running cars, it has taken no steps to provide substitute transportation or reimbursement, and is instead forcing Expedition and Navigator owners to choose between driving an unsafe car that is prone to spontaneous fires, or driving nothing—all the while remaining out of pocket for purchase funds that exceeded $50,000 and/or high monthly loan, lease, and insurance payments.

3. Model year 2021 Ford Expedition and Lincoln Navigator sport utility vehicles (the "Fire Defect Vehicles")[1] contain a defect in the engine compartment that can cause spontaneous fire while driving, while parked but on, and while parked and off (the "Spontaneous Fire Defect").

4. The Spontaneous Fire Defect exposes putative class members to an unreasonable risk of accident, injury, death, or property damage if their vehicle

---

[1] So far, Ford has recalled only a portion of its model year 2021 Expeditions and Navigators, but recently expanded this recall to include a larger manufacturing date range. Plaintiffs' counsel believes that the current manufacturing date range is underinclusive, based on the fire experienced by Plaintiff Paul Rich, as described herein. Plaintiffs' counsel continues to investigate whether broader manufacturing dates and other model years contain the same defect and should, therefore, be recalled. Plaintiffs may update the definition of Fire Defect Vehicles to include additional model years and/or an increased manufacturing date range.

catches fire while in operation or, perhaps more commonly, spontaneously ignites while the vehicle is parked at the class member's home, on a public street, or in a public parking lot. The Spontaneous Fire Defect also exposes passengers, other drivers on the road, neighbors, owners of other cars parked near the Fire Defect Vehicles, and other bystanders to an unreasonable risk of accident, injury, death, and property damage.

5. Plaintiff Paul Rich experienced precisely the untenable fire event that Ford is foisting upon all owners of Fire Defect Vehicles. Mr. Rich purchased new a 2021 Ford Expedition XLT in March 2022. Just three months later, on June 24, 2022, Mr. Rich parked his Expedition on the street in front of his home while he and his family were out running errands.

6. Mr. Rich's Expedition spontaneously ignited and burned itself and an empty recycling bin and wood compost that were nearby. Fortunately, a passerby saw the fire and called the local fire department, who were able to extinguish the blaze before it spread to Mr. Rich's home. The following pictures taken immediately after the fire show where the fire burned the battery junction box, just as Ford's recall describes, and spread to the car's exterior and flammable materials nearby.





7. Ironically, even though Mr. Rich appears to have experienced the exact fire that is the subject of Ford's expanded recall, he never got a recall notice

and will likely not get one under the recently expanded dates because they still do not include December 2021, when Mr. Rich's 2021 Expedition XLT was built.

8. The catastrophic fire risk is the direct result of a defect that was known or should have been known to Ford and is still unremedied by Ford. Not only did Ford fail to disclose the Spontaneous Fire Defect to consumers both before and after their purchases of the premium-priced model year 2021 Ford Expeditions and Lincoln Navigators, but it also misrepresented the vehicles' safety, reliability, functionality, and quality by this omission. Ford also omitted the consequences, including the serious safety hazards and monetary harm caused by the Spontaneous Fire Defect—e.g., damage to a home and injury or death to persons inhabiting that home should the Fire Defect Vehicle spontaneously ignite while the vehicle is parked adjacent to the house or in an attached garage.

9. To date, Ford has admitted there have been at least 21 fires in a vehicle population of just 66,000, a number that Ford acknowledges is ***statistically significant***. The fires have all occurred in the engine compartment of the Fire Defect Vehicles, and Ford has admitted that there is a manufacturing defect in a battery junction box that is causing these fires.

10. But Ford has yet to fix the dangerous Spontaneous Fire Defect and instead, Ford is merely advising owners and lessees to park the Fire Defect Vehicles away from homes and property. A vehicle that cannot be driven without

an unreasonable fire risk and cannot be parked or stored in or near the owner's residence is not fit for its ordinary purpose. Ford does not tell Fire Defect Vehicle owners and lessees just what constitutes a "safe" distance from a vehicle erupting in fire or explain what owners should do with their vehicles if they have no such place to park their vehicles. This places an unfair burden on class members who are unable to safely operate vehicles they paid a premium for and are unable to park in their garage (and may have to park quite far away from their homes to park away from other vehicles).

11. Many putative class members, like Plaintiffs Smith, Hampton, Stahlman, Caito, Hanley, Rezko, Mammel, Machanja, Kuhn, Sulligan, and Huntley, are not even able to comply with Ford's directive to park their Fire Defect Vehicles a "safe" distance from structures or other vehicles near their residences, let alone at places they might wish to drive their vehicles. Still others, justifiably not wanting to bear the risk of a catastrophic fire, may be forced to sell their Fire Defect Vehicles at a loss because of Ford's conduct and inability or unwillingness to provide any sort of fix. The Hobson's choice foisted on consumers by Ford is nothing short of outrageous.

12. Ford knew or should have known about the Spontaneous Fire Defect before the Fire Defect Vehicles went to market, and certainly knew well-before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Fire

Defect Vehicles; (2) the direct and public reports of fires in 21 Fire Defect Vehicles; and (3) Ford's own investigation of fires in the Fire Defect Vehicles.

13. Ford admits that a fix for the Spontaneous Fire Defect is at least months away for the majority of owners of Fire Defect Vehicles and offers no reimbursement to Fire Defect Vehicle owners and lessees for out-of-pocket expenses, loss of use, and loss of value. Because a repair is not yet available, putative class members are left without a safely operable vehicle for an unknown and potentially lengthy period.

14. To add further insult to injury, rather than do the right thing and globally offer every consumer a buy back of their Fire Defect Vehicle at a fair price—e.g., the Blue Book value on the day before the recall was announced—or at least offer to provide a comparable loaner or large rental SUV while storing the dangerous Fire Defect Vehicles until such time as it is able to repair them, Ford has done nothing of the sort. In fact, Ford has denied class members, like Plaintiffs Rezko, Hanley, Head, Kuhn, Sulligan, and Romo, these precise remedies when demanded.

15. Because of Ford's omissions and misrepresentations regarding the Spontaneous Fire Defect and failure to act more quickly in disclosing and providing a remedy, it has violated state consumer protection acts, been unjustly enriched, and breached implied warranties of merchantability. Plaintiffs and other

owners and lessees of the Fire Defect Vehicles have been injured in fact, incurred damages, and suffered ascertainable losses in money and property. Had Plaintiffs and the putative class members known of the Spontaneous Fire Defect, then they would either not have purchased or leased those vehicles or would have paid substantially less for them. Fires in the Fire Defect Vehicles also necessitate expensive repairs, car rentals, car payments, towing charges, property damage, time off work, loss of use, and other miscellaneous costs.

16. Plaintiffs bring this class action to redress Ford's misconduct. Plaintiffs seek damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, state consumer protection acts, state implied warranty acts, and unjust enrichment at common law.

## II. JURISDICTION

17. This Court has original jurisdiction over this lawsuit under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because Plaintiffs and Defendant are citizens of different states; there are more than 100 members of the Class and each Subclass (as defined herein); the aggregate amount in controversy exceeds $5 million, exclusive of attorneys' fees, interest, and costs; and class members reside across the United States. The citizenship of each party is described further below in the "Parties" section.

18. This Court has personal jurisdiction over the Defendant by virtue of its transactions and business conducted in this judicial district, and because Defendant is headquartered in Michigan. Defendant has transacted and done business, and violated statutory and common law, in the State of Michigan and in this judicial district.

## III. VENUE

19. Venue is proper in this judicial district under 28 U.S.C. § 1391 because Defendant transacts substantial business and is headquartered in this district.

## IV. PARTIES

### A. Plaintiffs

### 1. Lewis Hampton (California)

20. Plaintiff and proposed class representative Lewis Hampton ("Plaintiff" for purposes of this paragraph) is a resident and citizen of El Dorado Hills, California. Plaintiff purchased a 2021 Ford Expedition Max XLT in March 2021 from Future Ford in Sacramento, California. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased it as the primary vehicle for he and his wife and four young children, and his wife regularly drives it to drop the children off at school and get to work. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's

benefits for use by families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff and his wife are now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. All four of Plaintiff's young children are still in car seats of some kind and the ability to extract them safely and quickly from these seats in the event of a fire concerns Plaintiff. Plaintiff and his family would typically use the Expedition for family road trips but recently took their other vehicle instead because of the risk of the Spontaneous Fire Defect. Plaintiff and his wife currently park the Expedition in their driveway because street parking is inconvenient and difficult. When Plaintiff spoke to a Ford dealer, their only solution offered was to disconnect the battery if the vehicle is parked inside or near structures, which is also an inconvenience. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**2. Jeff Swanson (Colorado)**

21. Plaintiff and proposed class representative Jeff Swanson ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Berthoud, Colorado. Plaintiff purchased a 2021 Lincoln Navigator in March 2021 from Loveland Ford

Lincoln in Loveland, Colorado. Plaintiff's Lincoln Navigator is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff and his wife purchased it for use as a family vehicle with their six grandchildren. They were looking for a safe and reliable vehicle. As an auto enthusiast and car restorer, Plaintiff thoroughly researches vehicles before he purchases them. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff and his wife are now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. Since receiving notice of the recall, they have limited their use of the Navigator and park it outside their home, in violation of their neighborhood homeowners' association policy. When Plaintiff contacted his local Ford Lincoln dealer about the recall, the dealer was completely unaware of it. Plaintiff directed the dealer to contact Lincoln and get back to him about a solution. After talking to Ford, the dealer told Plaintiff there was no remedy and Plaintiff would simply have to wait for further information. Plaintiff is frustrated

that he spent roughly $100,000 for what he thought was a safe and reliable vehicle that has turned out to be unsafe and unreliable. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**3. Scott Barber (Connecticut)**

22. Plaintiff and proposed class representative Scott Barber ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Bozrah, Connecticut. Plaintiff purchased a 2021 Ford Expedition Limited in March 2021 from Central Ford in Plainfield, Connecticut. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased this vehicle through his business corporation Barber Electric, Inc. in which he is the sole shareholder, director, and president. The vehicle was purchased primarily for Plaintiff and his wife's use in the business. As a longtime Ford vehicle owner, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Since notice of the recall, Plaintiff and his wife have tried to limit their use of the Expedition where possible. They are not comfortable permitting employees or others to drive it and are concerned about safely parking the vehicle at job sites. They do not park

the Expedition in their home's garage, which is both an inconvenience and concern for maintaining the vehicle, particularly because Plaintiff takes great pride in and care for his vehicles. Plaintiff contacted two Ford dealers about a remedy, and both told him there is nothing they can do. They also told him that even if they could reimburse him for a rental car, it would only be $45 per day and that does not fully cover a rental cost for a similar class of vehicle to the Expedition. Plaintiff is frustrated and disappointed in Ford's response and the fact that he continues to make finance and insurance payments on the Fire Defect Vehicle while his use and storage of it is limited and modified because of the Spontaneous Fire Defect. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**4. Anthony Caito (Florida)**

23. Plaintiff and proposed class representative Anthony Caito ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Naples, Florida. Plaintiff purchased a 2021 Ford Expedition in October 2021 from Ferman Ford in Clearwater, Florida. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased this vehicle specifically for use in his limousine service transporting high net-worth clients. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety; these were primary reasons

Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and dependability of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Since notice of the recall, Plaintiff is concerned about the dangers associated with the Spontaneous Fire Defect but must continue to use the Expedition to transport customers. Plaintiff's commercial insurance requires the Expedition to be garaged, and garaging is the best practice given the tropical Florida weather where the vehicle is in use. But this conflicts with Ford's instructions to park the vehicle outside and away from structures, putting Plaintiff in an impossible position. Plaintiff would sell or trade the Expedition but its higher mileage and the lack of fix for the Spontaneous Fire Defect makes that difficult, and there is currently very little auto inventory available to replace it for his business. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**5. Jessica Stahlman (Florida)**

24. Plaintiff and proposed class representative Jessica Stahlman ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Mount Dora, Florida. Plaintiff purchased a 2021 Ford Expedition XLT in March 2021 from Mullinax Ford in Apopka, Florida. Plaintiff later purchased another 2021 Ford Expedition XLT in July 2021 from Mullinax Ford in Apopka, Florida. Plaintiff's

Ford Expeditions are both Fire Defect Vehicles equipped with the Spontaneous Fire Defect. Plaintiff and her husband purchased these vehicles through their jointly owned and managed dry-cleaning company. The vehicles were purchased primarily for use by company employees on delivery routes. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety; these were primary reasons Plaintiff purchased the Fire Defect Vehicles. However, despite touting the safety and dependability of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. One of Plaintiff's Expeditions was recalled first under the May 2022 recall, and now Plaintiff's other Expedition has been recalled in July 2022. On notice of each recall, Plaintiff completely ceased all use or operation of the Fire Defect Vehicles due to the dangers resulting from the Spontaneous Fire Defect. She cannot risk her safety, or that of her employees, by driving them, and continues to pay for and insure two vehicles she's owned for only about a year while they sit unused. Plaintiff also cannot park the vehicles off or away from her business property for insurance purposes, so the dangerous Fire Defect Vehicles must sit parked behind her dry-cleaning business. Plaintiff would not have purchased the two vehicles had Plaintiff known about the Spontaneous Fire Defect.

**6. Miranda Hanley (Georgia)**

25. Plaintiff and proposed class representative Miranda Hanley ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Stone Mountain, Georgia. Plaintiff and her husband purchased a 2021 Ford Expedition XLT in January 2022 from Hennessy Ford in Atlanta, Georgia. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased it as the primary vehicle for herself and her family while she was pregnant with her second child because they needed a larger family vehicle. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff is now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. Plaintiff's newborn and three-year-old must always ride in car seats and extracting them safely and quickly in the event of an engine fire would be difficult if not impossible. Plaintiff and her family use the Fire Defect Vehicle for family road trips and Plaintiff is concerned about taking it

on such trips, but her other vehicle does not have the necessary capacity. Parking the vehicle outside Plaintiff's garage does not eliminate the fire danger because her driveway and home are surrounded by trees. Also, Plaintiff is an attorney and drives the Expedition daily, and she often cannot avoid property and structures when parking at the office or courthouse. She is concerned about liability if her vehicle suffers a fire and damages nearby people or property. When Plaintiff contacted her Ford dealer about the recall and a remedy it had no solutions for her, instead denying her a loaner vehicle and a trade-in. Plaintiff financed her Fire Defect Vehicle for zero percent interest and cannot likely get that rate again in the current market conditions. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**7. William A. Head, III (Georgia)**

26. Plaintiff and proposed class representative William A. Head, III ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Bremen, Georgia. Plaintiff purchased a 2021 Ford Expedition Platinum in May 2021 from Pioneer Ford in Bremen, Georgia. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased it as the primary vehicle for his wife and two young children. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by

families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff and his wife are now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. One of Plaintiff's young children still rides in a child's booster seat and extracting them safely and quickly in the event of an engine fire is a concern to Plaintiff and his wife. Plaintiff's wife also uses the Expedition to carpool with her children and their two cousins frequently. The only solution offered by the Pioneer Ford dealership in response to the recall was to tell Plaintiff to park the vehicle in the dealership's open lot to avoid damaging Plaintiff's property in the event of a fire. After more than a month of parking the vehicle outside out of fear and repeatedly requesting a loaner vehicle, Pioneer Ford finally gave Plaintiff a loaner vehicle but only for a limited time. The loaner is a Chevy Equinox, which is a smaller model, so the seating capacity is significantly less than that of the Expedition, and its lower trim level lacks the comfort and safety features Plaintiff is accustomed to and explicitly sought out and paid for when buying the Expedition. Since the recall, Plaintiff and his family have already lost use of the vehicle, including on a recent road trip where the loaner did not have

the capacity needed and they didn't feel safe using the Expedition. Plaintiff purchased the Spontaneous Fire Vehicle for approximately $80,000 and is now concerned about the depreciation and money lost because of the Defect, particularly if he tries to sell or trade the vehicle. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**8. Clifford ("Greg") Mason (Illinois)**

27. Plaintiff and proposed class representative Clifford ("Greg") Mason ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Decatur, Illinois. Plaintiff purchased a 2021 Lincoln Navigator Reserve in January 2022 from Northside Ford Lincoln in Effingham, Illinois. Plaintiff's Lincoln Navigator is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased it as the primary vehicle for himself. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and luxury features; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and luxury aspects of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Since receiving notice of the recall, Plaintiff continues to drive the vehicle but cannot park it in his garage, and Plaintiff previously modified his garage to fit the Navigator after he purchased it. Plaintiff

also has a condominium in Florida but the building parking is underneath it and so he cannot park his Navigator there either. When Plaintiff called his local Lincoln dealer about the recall, the dealer had no recall fix, no new Navigators to trade for, and generally no solutions to offer him. Plaintiff is angry that Ford sold him an $85,000 vehicle that he cannot garage or drive without a fire risk. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**9. Richard Rezko (Illinois)**

28. Plaintiff and proposed class representative Richard Rezko ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Westmont, Illinois. Plaintiff purchased a 2021 Ford Expedition Platinum Max in November 2021 from Fox Ford Lincoln in Chicago, Illinois. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased it as the primary vehicle for his family, specifically to safely transport their two young children and third child currently on the way. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its

agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff is now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. Plaintiff's two- and three-year-old children must always ride in car seats and extracting them safely and quickly in the event of an engine fire would be difficult if not impossible. Plaintiff's wife is pregnant with their third child and the danger to both of them is also unacceptable. In addition, Plaintiff cannot safely park the Fire Defect Vehicle outside his garage and away from structures and other vehicles as Ford has instructed because Plaintiff's driveway is not big enough. Since receiving notice of the recall, Plaintiff repeatedly communicated with Ford representatives about buying back his Fire Defect Vehicle, but Ford has both mislead and ignored Plaintiff in response. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**10. Michael Mehling (Michigan)**

29. Plaintiff and proposed class representative Michael Mehling ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Rockford, Michigan. Plaintiff purchased a 2021 Ford Expedition XLT in January 2021 from Brighton Ford in Brighton, Michigan. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased it as his primary vehicle and specifically needed a large, safe, and reliable vehicle to

transport his three older children and two dogs. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff is now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. After receiving the recall notice, Plaintiff stopped parking the Expedition in his garage. Ford has not offered Plaintiff a remedy and Plaintiff is concerned about someone parking next to his Fire Defect Vehicle or the liability that may ensue if a fire erupts and damages surrounding people or property. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**11. Kathleen Holm (Montana)**

30. Plaintiff and proposed class representative Kathleen Holm ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Big Fork, Montana. Plaintiff purchased a 2021 Ford Expedition in January 2021 from Lithia Ford in Missoula, Montana. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased it for her primary use and to

transport her three young children. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff is now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. All three of Plaintiff's young children still ride in car seats and extracting them safely and quickly from the Expedition in the event of a fire would be difficult if not impossible. Since learning about the recall, Plaintiff must continue to drive the Fire Defect Vehicle because she does not have another option. She parks the vehicle outside her garage and away from structures, but still worries about a fire harming nearby people or property at her home or work. Plaintiff doesn't feel comfortable selling or trading the Expedition because of the unrepaired Spontaneous Fire Defect, even though she would like to sell it. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**12. Kelly Ernest (Montana)**

31. Plaintiff and proposed class representative Kelly Ernest ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Belgrade, Montana. Plaintiff purchased a 2021 Ford Expedition XLT in June 2021 from Laurel Ford in Laurel, Montana. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased it primarily as a family car for his wife to drive. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff and his wife are now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. They have three children aged ten and under, and the youngest is still in a car seat. Extracting the kids safely and quickly from the Expedition in the event of a fire would be difficult if not impossible. Plaintiff parks the Expedition outside his garage currently but began expanding the garage to accommodate the Expedition before notice of the recall. Because of the Defect, he will not be able to park his vehicle in

the garage as planned. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**13. Nancy Mammel (New Mexico)**

32. Plaintiff and proposed class representative Nancy Mammel ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Santa Fe, New Mexico. Plaintiff purchased a 2021 Lincoln Navigator in March 2022 from Corley's Albuquerque Lincoln in Albuquerque, New Mexico. Plaintiff's Lincoln Navigator is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased it because she needed a larger vehicle for errands and road trips. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and benefits like capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and other benefits of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff is now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. She had the vehicle for just over two months when it was recalled. Since receiving the recall notice, Plaintiff has limited her use of the vehicle and parks it outside her garage, but Plaintiff's driveway is near many trees that could easily ignite and spread fire

among her historic neighborhood if her vehicle has a fire. When Plaintiff contacted her Lincoln dealer about the recall and her concerns, they ignored her. Plaintiff would like to sell or trade the vehicle because of the Spontaneous Fire Defect but cannot do so until there is a recall fix. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**14. Jeremy Sessler (New York)**

33. Plaintiff and proposed class representative Jeremy Sessler ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Seaford, New York. Plaintiff and his wife leased a 2021 Lincoln Navigator in March 2021 from Hassett Ford in Wantagh, New York. Plaintiff's Lincoln Navigator is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff leased it as the primary vehicle for his wife and three young children. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families; these were primary reasons Plaintiff leased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the lease. Plaintiff is now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. Plaintiff has three young children that all ride in car

seats and extracting them all safely and quickly in the event of an engine fire would be difficult if not impossible. In addition, it is inconvenient and unsafe for Plaintiff to park the Fire Defect Vehicle on the street—under Ford's instruction to park outside and away from structures and other vehicles—with three small children that must be loaded into the vehicle daily. Plaintiff would not have leased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**15. Ronald ("RJ") Smith (North Carolina)**

34. Plaintiff and proposed class representative RJ Smith ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Raleigh, North Carolina. Plaintiff and his wife leased a 2021 Lincoln Navigator in July 2021 from Leith, Inc. in Raleigh, North Carolina. Plaintiff's Lincoln Navigator is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff leased it as the primary vehicle for his wife and three young children. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families; these were primary reasons Plaintiff leased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the lease. Plaintiff is now concerned about driving the Fire Defect Vehicle due to the dangers

resulting from the Spontaneous Fire Defect. Plaintiff's three small children must always ride in car seats and extracting them safely and quickly in the event of an engine fire would be difficult if not impossible. In addition, it is not feasible for Plaintiff to park the Fire Defect Vehicle outside his garage and away from structures and other vehicles as Ford has instructed because there are no such reasonably accessible spaces near Plaintiff's home. Plaintiff's driveway is steeply sloped and not suitable or safe to park or access the vehicle on it. Parking the Fire Defect Vehicle outside also risks damaging the vehicle given the surrounding trees and climate. Moreover, if Plaintiff switches vehicles with his wife, he will incur more than double the fuel costs to commute to work. Plaintiff would not have leased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**16. Kuya Machanja (Ohio)**

35. Plaintiff and proposed class representative Kuya Machanja ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Powell, Ohio. Plaintiff purchased a 2021 Ford Expedition XLT in May 2021 from Roush Ford in Columbus, Ohio. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff and his wife purchased it for use as a family vehicle, and to transport their young child. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by

families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff and his wife are now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. Plaintiff's two-year-old child still rides in a car seat and extracting them safely and quickly in the event of an engine fire is a concern to Plaintiff and his wife. Since receiving the recall notice, Plaintiff and his wife try to use their other vehicle instead of the Expedition when possible. Although they currently park the vehicle outside their garage, often they cannot completely avoid parking away from other structures and cars when they take it somewhere. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**17. Lisa Kuhn (Oklahoma)**

36. Plaintiff and proposed class representative Lisa Kuhn ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Broken Arrow, Oklahoma. Plaintiff purchased a 2021 Ford Expedition XLT in April 2021 from Matthews Ford in Broken Arrow, Oklahoma. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff and her husband

purchased it as their primary vehicle to share because it was their only vehicle, and to transport their family, including grandchildren, when they visited. As a longtime Ford customer, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff and her husband are now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. Plaintiff and her husband still drive the vehicle because they do not have another option. They are also worried about parking the vehicle outside their garage given the damaging effects of Oklahoma's hot and humid climate and the tornado-prone area where they live. This is the second safety recall Plaintiff has received for this Expedition since April 2022. The first involved the windshield wiper detaching while in use, and when Plaintiff inquired with Ford about the recall remedy, she was frustrated and concerned to hear the defect would not be remedied unless and until the windshield wiper actually failed and detached while in use. Plaintiff has communicated numerous times with Ford and its dealers about the Spontaneous Fire Defect and has received no satisfactory solution. They could

only suggest that she park the vehicle in the dealer's lot, and they would disconnect the battery. Because it is Plaintiff and her husband's only vehicle, and because they have put significant aftermarket money into aesthetic enhancements for the vehicle, this is not a viable option. Ford and its representatives also denied Plaintiff a loaner vehicle and refused to buy back her Fire Defect Vehicle. Plaintiff is angry that she has received no assistance from Ford for the Spontaneous Fire Defect, particularly when she has been a loyal Ford purchaser for many decades. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**18. Paul Rich (Oregon)**

37. Plaintiff and proposed class representative Paul Rich ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Canby, Oregon. Plaintiff purchased a 2021 Ford Expedition XLT in March 2022 from Ray Schultens Ford, Inc. in The Dalles, Oregon. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect.[2] Plaintiff purchased the vehicle primarily as a retirement vehicle. As a longtime Ford vehicle owner, Plaintiff was

---

[2] Plaintiff Rich's 2021 Expedition XLT is not within the current manufacturing date range of recalled vehicles, having been manufactured in December 2021. However, photographic evidence from the fire in Mr. Rich's Expedition appears to show the exact fire condition described by Ford in its recall. As a result, Plaintiffs' counsel believe that the recall should be expanded to at least cover the date of manufacture of Plaintiff Rich's Expedition, if not additional dates and model years.

aware of Ford's uniform and pervasive marketing messages of dependability and safety, and the vehicle's capacity and size benefits; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and size benefits of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff's vehicle was not included in the original 2021 Expedition recall, nor was it included under the July 2022 recall expansion. That means Plaintiff Rich was not aware his vehicle was at risk of the Spontaneous Fire Defect when, on June 24, 2022, Plaintiff's Expedition ignited while turned off and parked outside his home. No one was home at the time and the fire spread to some wood compost and an empty recycling bin nearby, but very luckily not Plaintiff's home. After a passersby called for help, the Canby Fire Department responded and extinguished the fire. Property and vehicle destruction aside, Plaintiff is now concerned that even if his vehicle is repaired and or rebuilt it will be worth less because it has suffered a fire. Plaintiff's wife also has an open order for the 2022 Ford Explorer that is scheduled to be delivered in August 2022 and given the fire and recall in the model year 2021 Expedition, she is now concerned and hesitant to accept this vehicle. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.



Plaintiff Paul Rich's 2021 Ford Expedition post-fire. Photo c/o Plaintiff Paul Rich.



Plaintiff Paul Rich's 2021 Ford Expedition and the fire damage. Photo c/o Plaintiff Paul Rich.



Plaintiff Paul Rich's 2021 Ford Expedition and the fire damage. Photo c/o Plaintiff Paul Rich.



Plaintiff Paul Rich's 2021 Ford Expedition and the fire damage. Photo c/o Plaintiff Paul Rich.

**19. Amber Sulligan (Pennsylvania)**

38. Plaintiff and proposed class representative Amber Sulligan ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Broomall, Pennsylvania. Plaintiff purchased a 2021 Ford Expedition Max Stealth in April 2021 from Springfield Ford in Broomall, Pennsylvania. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased it for use as a family vehicle with her husband, three kids, and two dogs. As a longtime Ford vehicle owner, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff and her husband are now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. Since receiving notice of the recall, they have limited their use of the Expedition but had to take it on a recent road trip because the dealer would not provide them a loaner. Plaintiff parks the vehicle in the driveway currently but there is still a fire risk given the proximity to her home. Plaintiff and her husband own three Ford vehicles with major safety recalls that currently have

no fix, including the Spontaneous Fire Defect here. Plaintiff is frustrated that she continues to make monthly payments on a vehicle she cannot use or store as intended. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**20. Jorge Romo (Texas)**

39. Plaintiff and proposed class representative Jorge Romo ("Plaintiff" for purposes of this paragraph) is a resident and citizen of The Woodlands, Texas. Plaintiff purchased a 2021 Lincoln Navigator in June 2021 from Planet Lincoln in Spring, Texas. Plaintiff's Lincoln Navigator is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff purchased it for his primary personal and business use, including as a family vehicle transporting his four children. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits for use by families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff is now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. One of Plaintiff's young children still rides in a car seat and extracting

them safely and quickly in the event of an engine fire would be difficult if not impossible. Since receiving the recall notice, Plaintiff has started parking the vehicle outside his garage but the hot, humid climate where he lives is damaging to his vehicle and makes it tougher to load his four kids in and out of the vehicle. He is also concerned because he needs to drive the vehicle frequently, and if mileage is a factor in the Spontaneous Fire Defect, then he is at higher risk. Plaintiff contacted his local Lincoln dealership and asked it to buy back his Navigator, but it refused because they do not buy vehicles with unrepaired recalls. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**21. Julie Huntley (Texas)**

40. Plaintiff and proposed class representative Julie Huntley ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Texarkana, Arkansas. Plaintiff purchased a 2021 Ford Expedition Platinum in April 2021 from McClarty Ford in Texarkana, Texas. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff and her husband purchased it primarily for Plaintiff's personal and work use. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability and safety; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety and

dependability of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff is now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. Plaintiff must drive the vehicle over the seventeen Arkansas counties she covers for work. Since receiving the recall, Plaintiff parks the vehicle outside in her driveway because she cannot park it in the street. Her husband's car and neighbors' cars are all nearby so the fire risk to other structures and property is not eliminated. When Plaintiff contacted her local Ford dealer about the recall and her concerns, she was told there was no fix and they did not offer her a loaner vehicle. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**22. Manuel Amores (Texas)**

41. Plaintiff and proposed class representative Manuel Amores ("Plaintiff" for purposes of this paragraph) is a resident and citizen of Spring, Texas. Plaintiff purchased a 2021 Ford Expedition Limited Stealth in June 2021 from Doggett Ford in Houston, Texas. Plaintiff's Ford Expedition is a Fire Defect Vehicle equipped with the Spontaneous Fire Defect. Plaintiff and his wife purchased it primarily for his wife's use with their two young children. Through exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and pervasive marketing messages of dependability, safety, and the vehicle's benefits

for use by families, including capacity and cargo room; these were primary reasons Plaintiff purchased the Fire Defect Vehicle. However, despite touting the safety, dependability, and family-friendly aspect of the Fire Defect Vehicles, at no point did Ford or its agents, dealers, or other representatives disclose the Spontaneous Fire Defect to Plaintiff before the purchase. Plaintiff and his wife are now concerned about driving the Fire Defect Vehicle due to the dangers resulting from the Spontaneous Fire Defect. Both of Plaintiff's young children ride in child car and booster seats and extracting them safely and quickly in the event of a fire would be difficult if not impossible. When Plaintiff received the recall notice they paused use of the Expedition while they attempted to obtain as much information about the fire risk as possible given Ford's vague and limited communications. Plaintiff and his wife started using the vehicle again because they need it and do not have another option. Plaintiff is also worried about parking his vehicle outside his garage given the damaging effects of the hot and humid climate where he lives. Plaintiff has had several communications with Ford dealers and representatives about the recall and his concerns, but none could perform the "mobile repair" of disconnecting the battery as an interim "fix" for the Defect or offer a loaner vehicle to Plaintiff. Ford said the vehicle could be stored at a dealership but could not say whether the vehicle would be stored in a garage or outside, and Plaintiff was left

without a resolution. Plaintiff would not have purchased the vehicle had Plaintiff known about the Spontaneous Fire Defect.

**B. Defendant**

42. Defendant Ford Motor Company ("Ford") is a Delaware limited liability company organized and existing under the laws of the State of Delaware. Ford's principal place of business and headquarters is One American Road, Dearborn, Michigan 48126.

43. Ford is a motor vehicle manufacturer and a licensed distributor of new, previously untitled Ford and Lincoln brand motor vehicles. The Ford brand is one of the "Big Three" American automobile brands. Lincoln is Ford's luxury automobile brand. Ford engages in commerce by distributing and selling new and used passenger cars and motor vehicles under its Ford and Lincoln brands.

44. Ford, through its various entities, designs, manufactures, markets, distributes, and sells automobiles throughout the U.S. and worldwide. Ford and its agents designed and manufactured the Fire Defect Vehicles. Ford also developed and disseminated the owner's manuals and warranty booklets, advertisements, brochures, and other promotional materials relating to the Fire Defect Vehicles, with the intent that such documents be purposely distributed throughout all fifty states. Ford is engaged in interstate commerce, selling vehicles through its network in every state of the United States.

45. As further detailed below, Ford- and Lincoln-authorized automobile dealerships act as Ford's agents in selling automobiles under the Ford and Lincoln brand names and disseminating vehicle information provided by Ford to customers. At all relevant times, Ford's dealerships served as its agents for motor vehicle repairs and warranty issues because they performed repairs, replacements, and adjustments covered by Ford's manufacturer warranty under the contracts between Ford and its nearly 10,000 authorized dealerships worldwide.

## V. FACTUAL ALLEGATIONS

### A. Ford marketed the Fire Defect Vehicles as family-friendly, functional, safe, and reliable, and knew these attributes were material to consumers.

46. Both the Ford and Lincoln Fire Defect Vehicles are marketed to consumers as family-friendly, functional, safe, reliable vehicles, and Ford knew these qualities were material to consumers in marketing them in this manner. These qualities were in fact material to Plaintiffs.

47. In the sales brochure for the 2021 Ford Expedition, Ford focuses on families from the start because it knew this attribute was material to Plaintiffs and putative class members, saying "Whether you choose Expedition or Expedition MAX – which is nearly a foot longer and can carry 16.9 more cu. ft. of gear – ***these spacious vehicles are designed with you and your family in mind***."

(Emphasis added.) And, "For years, we've put our hearts and souls into building a better big for your family and your adventures."[3]

> How big is big enough when it comes to maximizing your adventures? That's for you to decide – and the 2021 Ford Expedition® to provide.
>
> Whether you choose Expedition or Expedition MAX – which is nearly a foot longer and can carry 16.9 more cu. ft. of gear[1] – these spacious vehicles are designed with you and your family in mind. From roomy interiors with seating for up to 8 in a range of durable fabrics and available leather trims, to innovative technologies and standard Ford Co-Pilot360™ that can help you navigate new roads,[2] in Expedition, every drive is big on comfort and convenience. And, with 2 EcoBoost® engines to choose from, no matter where you're headed, you'll have plenty of power to help get you there.
>
> For years, we've put our hearts and souls into building a better big for your family and your adventures. The 2021 Ford Expedition is one of our best yet.

48. Ford also touts the Expedition's accommodation of child seats, saying the following: "And, with available 2nd-row power-folding tip-and-slide seats, you can keep a child seat secured in any section of the seat, while simply sliding it forward to allow passengers to get into the 3rd row."[4]

> Take a seat in the available 10-way power driver's seat, settle into the available 2nd-row captain's chairs – available in either leather or ActiveX™ Seating Material – or relax in the available power-reclining PowerFold® 3rd-row seats with a 60/40 split, and you'll quickly see that Ford Expedition® is big on space and even bigger on comfort. With plenty of space for up to 8 passengers, everyone will appreciate the expansive room. And, with available 2nd-row power-folding tip-and-slide seats, you can keep a child seat secured in any section of the seat, while simply sliding it forward to allow passengers to get into the 3rd row. No matter where you find your place, in Expedition, you're sure to find your comfort zone.

49. Ford also sells consumers on the size and functionality of the Expedition—another significant material feature for families—noting the Expedition's extra cargo room and larger rear door opening for "easier entry and exit."[5]

---

[3] *See* **Exhibit 1**, MY 2021 Ford Expedition brochure, at 2.
[4] *See id.* at 4.
[5] *See id.* at 5.



011101-11/1947091 V1


There's a lot that goes into your everyday, so you need a vehicle that can handle just about anything. Like the new 5-passenger Ford Expedition® STX. With STX, you'll always have available cargo room behind the 2nd row – without the need to fold down any seats. And, for even more space – nearly a foot more length with an additional 16.9 cu. ft.[1] to accommodate most anything you need to carry – the Expedition MAX gives you all the room you need, in all the right places. Larger rear door openings make for easier entry and exit. An available advanced cargo manager shelf helps keep things in order. And an available hands-free, foot-activated liftgate opens with a simple wave of your foot under the bumper – all while keeping your key fob in your pocket or purse. A liftgate glass that can be opened manually or with the liftgate itself makes accessing everything you're carrying easier, too.

50. In addition to the Expedition's suitability for families, Ford also stressed the alleged safety of the vehicles, as Ford knew this was a material attribute for consumers. Promising consumers can "[c]ommand the road with confidence" in the Expedition, Ford touted various safety features like pre-collision assist, blind spot alerts, lane-keeping system, and rear-view cameras in the Fire Defect Vehicles.[6]







[6] *See id.* at 7.

51. Ford also markets the power and reliability of the Expedition and its engine, saying, "The 2021 Ford Expedition doesn't just get you there, it gets you here, there and virtually everywhere you want to go thanks to the power of its EcoBoost engine and up to 400 horsepower and 480 lb.-ft. of torque, and "delivers consistent engine power for a great drive every time."[7]


The 2021 Ford Expedition® doesn't just get you there, it gets you here, there and virtually everywhere you want to go thanks to the power of its EcoBoost® engine and up to 400 horsepower[1] and 480 lb.-ft. of torque[1] A 10-speed automatic transmission with SelectShift® capability helps maximize power, while the available Terrain Management System™ allows you to choose from 7 preset drive modes – easily selected with a simple turn of a dial – to help optimize driving dynamics to the road conditions. Choose Expedition MAX with a 27.8-gallon fuel capacity, and you'll see how getting places in Expedition just got easier.


3.5L ECOBOOST V6
With 375 max. horsepower[1] and 470 max. lb.-ft. of torque,[1] this twin-turbocharged, port- and direct-fuel-injected engine delivers big acceleration. The wide 7.4:1 gear ratio span of the 10-speed transmission helps smooth out gear shifts and delivers consistent engine power for a great drive every time.

52. In the sales brochure for the 2021 Lincoln Navigator, Ford again opens with a focus on the vehicle's suitability and function for families, including photos of children with the vehicle, and saying, "Whatever adventures the day holds for you and your family, the 2021 Lincoln Navigator makes sure they start with a warm embrace" and "Celebrate all of life's travels together in Navigator."[8] Ford markets the Navigator as family-friendly because it knows this attribute is and was material to Plaintiffs and putative class members.

---

[7] *See id.* at 8.
[8] *See* **Exhibit 2**, MY 2021 Lincoln Navigator brochure at 2.

> **Always begin on a bright note.**
>
> Whatever adventures the day holds for you and your family, the 2021 Lincoln Navigator makes sure they start with a warm embrace. As you approach, Navigator awakens with a graceful greeting. Dynamic signature lighting flows outward beneath the headlamps, while the available illuminated Lincoln Star on the grille glows from within. Power-deployable running boards, backlit door handles and luminous welcome mats invite everyone inside. Brighten your evening journeys with available illumination for the first 2 rows of safety belt buckles. Celebrate all of life's travels together in Navigator.

53. Ford also touts the passenger seat and row sizes, cargo room, and other functional aspects of the Navigator—again, material to and sought after by consumers with children, including Plaintiffs—saying, "From epic road trips to everyday errands, your family deserves the luxurious comfort of Navigator."[9] Plaintiff Sessler, for example, leased his Fire Defect Vehicle in large part because of its size and reliability for frequent trips upstate with his family of five.

> PAMPER YOUR PASSENGERS
>
> From epic road trips to everyday errands, your family deserves the luxurious comfort of Navigator. Relaxing is easy with ample 2nd-row leg room, plus an available power, panoramic Vista Roof® that offers skyward views. Seat up to 7 with the heated 2nd-row PowerFold® captain's chairs, and your choice of a pass-through to the 3rd row or an available center console. To seat up to 8, select the available 2nd-row PowerFold bench seat, which also features heated outboard positions and a class-exclusive, independently sliding middle seat.
>
> Treat your passengers to the available Lincoln Play™ Rear-Seat Entertainment System featuring 2 vibrant 10" screens. Plus, everyone can take advantage of 6 USB ports, four 12V powerpoints and a 110V/150W AC power outlet for recharging all sorts of devices.

54. Ford markets the Navigator's towing abilities—another quality important to many families—saying, "Navigator makes it easy to enrich your adventures with family and friends."[10]

---

[9] *See id.* at 4.

[10] *See id.* at 7.

55. Because safety is material to Plaintiffs and putative class members, Ford tells consumers they can "journey with confidence" in the Navigator due to its "extensive collection of standard and available driver-assist technologies utiliz[ing] a network of sensors and sophisticated cameras to offer you support during many scenarios."[11]

> JOURNEY WITH CONFIDENCE
>
> Our extensive collection of standard and available driver-assist technologies[1] utilizes a network of sensors and sophisticated cameras to offer you support during many scenarios. These advanced features are all aimed at helping you feel confident in the 2021 Lincoln Navigator.

56. Ford further highlights the Navigator's engine performance and reliability, saying "Navigator also reinforces your calm confidence with best-in-class 450 horsepower and 510 lb.-ft. of torque produced by its Twin-Turbocharged 3.5-liter V6 engine."[12] The Navigator's reliability is material and critical for purchasers and lessees, including Plaintiffs.

---

[11] *See id.* at 5.

[12] *See id.* at 6.

> GLIDE EFFORTLESSLY
>
> Imagine yourself calmly in command – at peace with your surroundings. The standard Adaptive Suspension helps take you there smoothly by isolating the vehicle from road imperfections, while enhanced sound-absorbing materials and Active Noise Control help keep road noise at bay. The result is a relaxing atmosphere conducive to quiet contemplation or pleasant conversation.
>
> Navigator also reinforces your calm confidence with best-in-class 450 horsepower[1] and 510 lb.-ft. of torque[1] produced by its Twin-Turbocharged 3.5-liter V6 engine. The 3.5-liter is mated to a 10-speed SelectShift® automatic transmission designed to adapt in real-time, engaging the right gear at the right time to deliver the performance you seek.

57. Consumers paid a premium price for the Fire Defect Vehicles. The Manufacturer's Suggested Retail Price ("MSRP") for the 2021 Ford Expedition starts at $51,320 for the XL Fleet base-level trim and goes up to $78,070[13], and the MSRP for the 2021 Lincoln Navigator starts at $78,400 for the base-level trim and goes up to a whopping $103,550.[14]

58. Plaintiffs and putative class members paid the premium prices commanded by the Fire Defect Vehicles because of these qualities touted by Ford.

[13] *See* **Exhibit 3**, *2021 Ford Expedition MSRP and Invoice Price*, EDMUNDS.COM, https://www.edmunds.com/ford/expedition/2021/msrp/ (last visited June 7, 2022).

[14] *See* **Exhibit 4**, *2021 Lincoln Navigator MSRP and Invoice Price*, EDMUNDS.COM, https://www.edmunds.com/lincoln/navigator/2021/msrp/ (last visited June 7, 2022).

## B. Ford's Vehicle Warranties

59. Ford's New Vehicle Limited Warranty for the model year 2021 Ford Expedition provides "bumper-to-bumper" coverage for 3 years/36,000 miles, whichever comes first.[15] Ford's Powertrain Warranty for the Expedition provides coverage for 5 years/60,000 miles, whichever comes first.[16] On information and belief, this warranty coverage includes manufacturing defects like the Spontaneous Fire Defect in the Fire Defect Vehicles.

60. Ford's New Vehicle Limited Warranty for the model year 2021 Lincoln Navigator provides "bumper-to-bumper" coverage for 4 years/50,000 miles, whichever comes first.[17] Ford's powertrain warranty for the Navigator also protects certain components against defects in factory-supplied materials or workmanship for 6 years or 70,000, whichever comes first.[18] On information and belief, this warranty coverage includes manufacturing defects like the Spontaneous Fire Defect in the Fire Defect Vehicles.

---

[15] *See* **Exhibit 1**, MY 2021 Ford Expedition brochure, at 15.

[16] *See id.*

[17] *See* **Exhibit 5**, Linsay Thomas and Noelle Talmon, *Lincoln's Factory Warranty Largely Equals Its Competitors*, THE DRIVE.COM, https://www.thedrive.com/reviews/29443/lincoln-warranty (last accessed June 7, 2022).

[18] *See id.*

61. Because the Fire Defect Vehicles are all model year 2021 vehicles sold or leased to putative class members in the fourth quarter of 2020 or later,[19] virtually all Fire Defect Vehicles—if not all of them, including Plaintiffs' vehicles—are still covered under Ford's new vehicle and powertrain warranties.

**C. The Spontaneous Fire Defect**

62. As Ford now admits in a May 17, 2022 safety recall notification to the National Highway Traffic Safety Administration ("NHTSA"), a defect exists in the engine compartment of the Fire Defect Vehicles that can cause them to spontaneously burst into flames while in operation, while parked and running, or while parked and off.[20]

63. Ford further admits that the Fired Defect Vehicles "pose a risk of underhood fire, including while the vehicle is parked and off."[21]

---

[19] *See* **Exhibit 6**, Brett Foote, *2021 Ford Expedition Order and Production Dates Revealed*, FORD AUTHORITY.COM, July 15, 2020, https://fordauthority.com/2020/07/2021-ford-expedition-order-and-production-dates-revealed/ (last accessed June 7, 2022); *see* **Exhibit 7**, Brett Foote, *2021 Lincoln Navigator Order and Production Dates Revealed*, FORD AUTHORITY.COM, July 15, 2020, https://fordauthority.com/2020/07/2021-lincoln-navigator-order-and-production-dates-revealed/ (last accessed June 7, 2022).

[20] *See* **Exhibit 8**, May 18, 2022 NHTSA letter to Ford, https://static.nhtsa.gov/odi/rcl/2022/RCAK-22V346-9658.pdf (last accessed June 7, 2022).

[21] *See* **Exhibit 9**, May 17, 2022 Part 573 Safety Recall Report, https://static.nhtsa.gov/odi/rcl/2022/RCLRPT-22V346-3365.PDF (last accessed June 7, 2022).

64. Ford's recall, number 22V-346, affects 32,711 model year 2021 Ford Expeditions and 6,302 model year 2021 Lincoln Navigators all built between December 1, 2020, and April 30, 2021.[22]

65. As of May 12, 2022, Ford reported sixteen (16) underhood fires in the Fire Defect Vehicles, including one that resulted in a burn injury. Twelve (12) of these fire incidents occurred while the vehicle was parked and off, one (1) occurred while the vehicle was parked and on, and three (3) occurred while driving, with the occupants reporting a burning smell and smoke from the front passenger engine compartment.[23]

66. Ford admitted that sixteen engine compartment fires from a vehicle population of roughly 39,000, all produced in a four-month period, is "***statistically significant***."[24] (Emphasis added.)

67. Ford notes that fourteen (14) of the fires were in rental vehicles from various companies and locations, which suggests that the Spontaneous Fire Defect may be related to mileage or use, thereby increasing the risk to Plaintiffs and the Class if they continue to use their vehicles. Regardless, Ford has not instructed consumers to stop driving their vehicles.

---

[22] *See id.*

[23] *See* **Exhibit 10**, Chronology of Defect/Noncompliance Determination, https://static.nhtsa.gov/odi/rcl/2022/RMISC-22V346-1971.pdf (last accessed June 7, 2022).

[24] *See id.*

68. On July 11, 2022, Ford announced through press that it had identified the cause of the Spontaneous Fire Defect and was expanding its recall to include 66,221 vehicles.[25] Ford claims it has identified a manufacturing defect in a battery junction box in the Fire Defect Vehicles and it has designed a fix.[26] Yet Ford admits that only about one-third of the Fire Defect Vehicles can be fixed now, and it estimates September at the earliest for it to have the parts needed for repairs in the rest of the Fire Defect Vehicles.

69. Ford also admitted that its investigation revealed five additional spontaneous fire incidents caused by the Spontaneous Fire Defect, which led it to expand the recall population by approximately 27,000 cars.

70. While it still cannot provide a repair to owners of Fire Defect Vehicles, Ford is offering nothing to the owners of these very expensive vehicles, it simply instructs them to park their vehicles outside and away from structures until their cars can actually be rendered safe for their intended use.

71. On information and belief, Ford failed to adequately research, design, test, and manufacture the Fire Defect Vehicles before warranting, advertising,

---

[25] *See* **Exhibit 11**, Lurah Lowery, *Ford announces repair for recalled Expeditions & Navigators, expands recall population*, REPAIRER DRIVEN NEWS.COM, July 11, 2022, https://www.repairerdrivennews.com/2022/07/11/ford-announces-repair-for-recalled-expeditions-navigators-expands-recall-population/ (last accessed July 11, 2022).

[26] *See id.*

promoting, marketing, and selling the Fire Defect Vehicles as suitable and safe for use in an intended and reasonably foreseeable manner.

72. On information and belief, Ford knew or should have know the Fire Defect Vehicles contained the Spontaneous Fire Defect and should have warned or disclosed this fact to Plaintiffs and putative class members before selling or leasing the vehicles.

73. So far, Ford has only recalled model year 2021 Ford Expedition and Lincoln Navigator models that were manufactured between July 27, 2020, and August 31, 2021, but it continues to sell these and other vehicles, which may have the same defectively manufactured components.

74. Accordingly, Plaintiffs' counsel continues to investigate whether additional manufacturing periods and model years of the Expedition and Navigator are also plagued with the Spontaneous Fire Defect.

### D. Ford knew or should have known of the Spontaneous Fire Defect before it disclosed the defect to Plaintiffs.

75. On information and belief, Ford knew or should have known about the Spontaneous Fire Defect before the Fire Defect Vehicles went to market, and it certainly knew well-before it issued its recall, as evidenced by: (1) the rigorous pre-launch testing of the Fire Defect Vehicles; (2) the direct and public reports of fires in 21 Fire Defect Vehicles; and (3) Ford's own investigation of fires in the Fire Defect Vehicles.

**1. Ford's durability testing should have uncovered the Spontaneous Fire Defect.**

76. Ford claims to conduct comprehensive and rigorous testing on all its vehicles, saying, "Ford's comprehensive lineup of testing facilities around the world puts vehicles through everything from the extreme, to the everyday, to ensure that only world-class vehicles roll off the production line."[27]

77. According to Ford, at their facilities across Thailand, India, Australia, the Middle East, and China, "Ford vehicles and components are 'shaken, rattled and rolled' in a variety of tests, some conducted in temperatures ranging from an arctic minus 40 degrees Celsius, to desert-scorching heat of over 50 degrees Celsius."[28] These tests include stresses on the engines, moving parts, suspension, and electrical components.[29]

78. Ford even puts its vehicles through a Total Durability Cycle, described by Ford as "sped-up evaluation runs around the clock, day and night, to simulate 10 years, or 240,000km, of severe customer usage in just a few weeks."[30] "Gravel roads, cobblestones, pot-holes, curbs and water baths feature in this

---

[27] *See* **Exhibit 12**, *Testing in the Extremes: How Ford's Multiple Testing Facilities Push Vehicles to the Limit*, October 7, 2019, FORD.COM, https://media.ford.com/content/fordmedia/img/me/en/news/2019/10/07/testing-in-the-extremes--how-fords-multiple-testing-facilities-p.html (last accessed June 7, 2022).

[28] *See id.*

[29] *See id.*

[30] *See id.*

grueling test," and, "Just for good measure, environmental factors like dust, water and mud are thrown in, while dynamometers simulate towing heavy loads in traffic and over mountain passes."[31]

79. On information and belief, the Fire Defect Vehicles were put through similar durability testing or designed and built in accordance with the findings of such durability testing.

80. Based on such durability testing, Ford should have uncovered the Spontaneous Fire Defect before the Fire Defect Vehicles were sold to Plaintiffs and the putative class members.

**2. Ford knew about the Spontaneous Fire Defect from reports of fires in 21 Fire Defect Vehicles and its own investigation.**

81. According to its recall chronology, Ford opened an investigation into the fires on March 24, 2022. By that time, Ford reports knowledge of ***nine (9) fire reports***, including fires while driving and while parked and off.

82. Ford's investigation continued up until the May 2022 recall and uncovered ***seven (7) more fires*** in the Fire Defect Vehicles. Ford's investigation consisted of reviews and site visits with the rental car companies where some of the fires occurred, vehicle inspections, supplier reviews, product design reviews, and field and connection data analyses. By July 11, 2022, Ford had discovered an

[31] *See id.*

additional five (5) fires in the Fire Defect Vehicles and it expanded the manufacturing range of Fire Defect Vehicles to include over 66,000 Expeditions and Navigators.

83. Ford did not disclose the dates of the 21 fires in the Fire Defect Vehicles, but on information and belief, Ford learned of at least some of these fires on or before the March 24, 2022 investigation launch.

84. All vehicle manufacturers, including Ford, also routinely monitor and analyze NHTSA complaints to determine whether vehicles or components should be recalled due to safety concerns. Thus, on information and belief, Ford has knowledge of all NHTSA complaints filed concerning the vehicles it manufactures, including the Fire Defect Vehicles. *See* TREAD Act, Pub. L. No. 106-414, 114 Stat. 1800 (2000).

85. Ford also receives complaints directly from consumers and its dealers, and thus, on information and belief, has knowledge of all complaints lodged to it or its agents regarding the Fire Defect Vehicles and the Spontaneous Fire Defect. At a minimum, Ford received complaints from terrified and angry owners and lessees such as Plaintiffs Sessler, Smith, Mason, and Kuhn after learning about the Spontaneous Fire Defect.

86. However, Ford has yet to actually fix any of the Fire Defect Vehicles. Instead, Ford advises the hapless Fire Defect Vehicle owners and lessees to park

them away from their homes and other property. Ford does not explain what constitutes a safe distance from a vehicle that spontaneously burst into flames, or what owners should do with their vehicles if they have no such place to park them, or what owners who rely on these vehicles to transport their families daily can do to avoid a fire while driving. And Ford is not globally offering to buy back the vehicles or even provide loaner or rental vehicles until it can fix the problem.

87. Faced with this Hobson's choice foisted upon them by Ford, owners and lessees of the Fire Defect Vehicles predictably and reasonably have made a variety of choices. Some can comply with Ford's instructions and have distant parking spaces they can access at great inconvenience and risk to their vehicles and family of parking in distant and/or unsafe locations. Many, like Plaintiffs Smith, Hampton, Stahlman, Caito, Hanley, Rezko, Mammel, Machanja, Sulligan, and Huntley, are simply unable to find a "safe" place to park their Fire Defect Vehicles at home, work, and/or anywhere else they need to take their vehicles and have no choice but to park them in unsafe locations. Others have elected to limit or cease their use of the vehicle altogether.

88. On information and belief, some owners—justified in their unwillingness to play Russian roulette with their vehicles—are selling or trading them in at greatly reduced prices because of Ford's conduct.

89. All owners and lessees of the Fire Defect Vehicles have suffered ascertainable loss.

**E. There is an agency relationship between Ford and Ford dealerships.**

90. On information and belief, the manufacturer Ford has impliedly or expressly acknowledged that Ford-authorized dealerships are its sales agents, the dealers have accepted that undertaking, Ford can control authorized Ford dealers, and Ford acts as the principal in that relationship, as is shown by the following:

i. Ford can terminate the relationship with its dealers at will.

ii. The relationships are indefinite.

iii. Ford is in the business of selling vehicles as are its dealers.

iv. Ford provides tools and resources to help Ford dealers sell vehicles.

v. Ford supervises its dealers regularly.

vi. Without Ford, the relevant Ford dealers would not exist.

vii. Ford requires the following of its dealers.

1. Reporting of sales;
2. Computer network connection with Ford;
3. Training of dealers' sales and technical personnel;
4. Use of Ford-supplied computer software;
5. Participation in Ford's training programs;
6. Establishment and maintenance of service departments in Ford dealerships;

7. Certification of Ford pre-owned vehicles;

8. Reporting to Ford with respect to the car delivery, including reporting Plaintiffs' names, addresses, preferred titles, primary and business phone numbers, e-mail addresses, vehicle VIN numbers, delivery date, type of sale, lease/finance terms, factory incentive coding, if applicable, vehicles' odometer readings, extended service contract sale designations, if any, and names of delivering dealership employees; and

9. Displaying Ford logos on signs, literature, products, and brochures within Ford dealerships.

viii. Dealerships bind Ford with respect to:

1. Warranty repairs on the vehicles the dealers sell; and

2. Issuing service contracts administered by Ford.

ix. Ford further exercises control over its dealers with respect to:

1. Financial incentives given to Ford dealer employees;

2. Locations of dealers;

3. Testing and certification of dealership personnel to ensure compliance with Ford's policies and procedures; and

4. Customer satisfaction surveys, pursuant to which Ford allocates the number of Ford cars to each dealer, thereby directly controlling dealership profits.

x. Ford dealers sell Ford vehicles on Ford's behalf, pursuant to a "floor plan," and Ford does not receive payment for its cars until the dealerships sell them.

xi. Dealerships bear Ford's brand names, use Ford's logos in advertising and on warranty repair orders, post Ford- and Lincoln-branded signs for the public to see, and enjoy a franchise to sell Ford's products, including the Fire Defect Vehicles.

xii. Ford requires Ford dealers to follow the rules and policies of Ford in conducting all aspects of dealer business, including the delivery of Ford's warranties described herein, and the servicing of defective vehicles such as the Fire Defect Vehicles.

xiii. Ford requires its dealers to post Ford's brand names, logos, and signs at dealer locations, including dealer service departments, and to identify themselves and to the public as authorized Ford dealers and servicing outlets for Ford cars.

xiv. Ford requires its dealers to use service and repair forms containing Ford's brand names and logos.

xv. Ford requires Ford dealers to perform Ford's warranty diagnoses and repairs, and to do the diagnoses and repairs according to the procedures and policies set forth in writing by Ford.

xvi. Ford requires Ford and Lincoln dealers to use parts and tools either provided by Ford, or approved by Ford, and to inform Ford when dealers discover that unauthorized parts have been installed on one of Ford's vehicles.

xvii. Ford requires dealers' service and repair employees to be trained by Ford in the methods of repair of Ford. and Lincoln-branded vehicles.

xviii. Ford audits Ford dealerships' sales and service departments and directly contacts the customers of said dealers to determine their level of satisfaction with the sale and repair services provided by the dealers; dealers are then granted financial incentives or reprimanded depending on the level of satisfaction.

xix. Ford requires its dealers to provide Ford with monthly statements and records pertaining, in part, to dealers' sales and servicing of Ford vehicles.

xx. Ford provides technical service bulletins and messages to its dealers detailing chronic defects present in product lines, and repair procedures to be followed for chronic defects.

xxi. Ford provides its dealers with specially trained service and repair consultants with whom dealers are required by Ford to consult when dealers are unable to correct a vehicle defect on their own.

xxii. Ford requires Ford and Lincoln vehicle owners to go to authorized Ford and Lincoln dealers to obtain servicing under Ford warranties.

xxiii. Ford dealers are required to notify Ford whenever a car is sold or put into warranty service.

## VI. TOLLING OF THE STATUTE OF LIMITATIONS

### A. Discovery Rule Tolling

91. Because Ford omitted the existence of the Spontaneous Fire Defect, Class members had no way of knowing about the unreasonable fire risk of the Fire Defect Vehicles.

92. Within the period of any applicable statutes of limitation, Plaintiffs and members of the proposed Classes could not have discovered through the exercise of reasonable diligence that Ford was omitting the Defect complained of herein.

93. Plaintiffs and the other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that Ford did not report information within its knowledge to federal and state authorities, its dealerships, or consumers; nor would a reasonable and diligent investigation have disclosed that Ford had omitted information about the unreasonable fire risk of the

Fire Defect Vehicles, which was discovered by Plaintiffs only shortly before this action was filed.

94. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the Fire Defect Vehicles.

### B. Estoppel

95. Ford was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the fire risk of the Fire Defect Vehicles.

96. Ford knowingly, affirmatively, and actively concealed or recklessly disregarded the true nature, quality, and character of the fire risk of the Fire Defect Vehicles.

97. Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## VII. CLASS ALLEGATIONS

98. Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class and subclasses:

> **Nationwide Class**: All persons or entities who purchased or leased model year 2021 Ford Expedition or Lincoln Navigator vehicles (the "Fire Defect Vehicles").

**California Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of California.

**Colorado Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Colorado.

**Connecticut Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Connecticut.

**Florida Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Florida.

**Georgia Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Georgia.

**Illinois Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Illinois.

**Michigan Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Michigan.

**Montana Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Montana.

**New Mexico Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of New Mexico.

**New York Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of New York.

**North Carolina Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of North Carolina.

**Ohio Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Ohio.

**Oklahoma Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Oklahoma.

**Oregon Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Oregon.

**Pennsylvania Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Pennsylvania.

**Texas Subclass**: All persons or entities who purchased or leased one or more of the Fire Defect Vehicles in the State of Texas.

99. Plaintiffs assert claims under the laws of each state set forth below.

100. Excluded from the definitions of each Class and Subclass are any personal injury or property damages claims resulting from the fires or explosions caused by the Fire Defect Vehicles. Also excluded from the Class and Subclasses are Ford and its subsidiaries and affiliates; all persons who make a timely election to be excluded from this action; governmental entities; the Judge to whom this case is assigned and his/her immediate family; and Plaintiffs' Counsel. Plaintiffs reserve the right to revise the Class and Subclass definitions based upon information learned through discovery.

101. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

102. This action has been brought and may be properly maintained on behalf of the Classes and Subclasses proposed herein under Federal Rule of Civil Procedure 23.

103. **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of each Class and Subclass are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. For purposes of this complaint, Plaintiffs allege that there are estimated to be at least 66,221 or more Fire Defect Vehicles in the Nationwide Class. The precise number of Class and Subclass members is unknown to Plaintiffs but may be ascertained from Ford's books and records. Class and Subclass members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, internet postings, and published notice.

104. **Commonality and Predominance**: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class and Subclass members, including, without limitation:

a. Whether Ford engaged in the conduct alleged herein;

b. Whether the Spontaneous Fire Defect creates an unreasonable risk of fires in the Fire Defect Vehicles;

c. When Ford first knew about the Spontaneous Fire Defect;

d. Whether Ford designed, manufactured, marketed, and distributed the Fire Defect Vehicles with defective component(s) that cause under hood fire;

e. Whether Ford's conduct renders it liable for breach of the implied warranty of merchantability;

f. Whether Ford has been unjustly enriched at the expense of Plaintiffs and the Class and Subclasses;

g. Whether Plaintiffs and the other Class and Subclass members overpaid for their vehicles at the point of sale; and

h. Whether Plaintiffs and the other Class and Subclass members are entitled to damages and other monetary relief and, if so, in what amount.

105. **Typicality**: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class and Subclass members' claims because, among other things, all Class and Subclass members were comparably injured through Ford's wrongful conduct as described above.

106. **Adequacy**: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class and Subclass representatives because their interests do not conflict with the interests of the other members of the Class and Subclasses they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The

Class and Subclasses' interests will be fairly and adequately protected by Plaintiffs and their counsel.

107. **Superiority**: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class and Subclass members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for the members of the Class and Subclasses to individually seek redress for Ford's wrongful conduct. Even if Class and Subclass members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

# VIII. CLAIMS

## A. Nationwide Claims

### COUNT I

### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT (15 U.S.C. § 2301, *et seq.*)

### (Alleged by all Plaintiffs on behalf of the Nationwide Class)

108. Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

109. Plaintiffs bring this claim on behalf of the Nationwide Class.

110. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

111. The Fire Defect Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiffs and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

112. Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

113. 15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

114. Ford provided Plaintiffs and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an “implied warranty” within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Fire Defect Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

115. Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiffs under 15 U.S.C. § 2310(d)(1). Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with a defect in the engine compartment that makes the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles, as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders. The Spontaneous Fire Defect rendered the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing when not in use) when they were sold or leased, and at all times thereafter. In fact, because of the Spontaneous Fire Defect, Ford

specifically advised owners and lessees to park their vehicles outside and away from structures.

116. As discussed herein, on information and belief, Ford knew or should have known about the Spontaneous Fire Defect from its own durability testing of the Fire Defect Vehicles before launching the Fire Defect Vehicles. Ford omitted information about the Defect and its consequences from Plaintiffs and Class members, misrepresented the qualities of the Fire Defect Vehicles, and has failed to provide a fix for the Defect.

117. Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Fire Defect Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

118. Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiffs, because, at the time of purchase and lease, Plaintiffs had no other options for purchasing warranty coverage other than directly from Ford.

119. Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew or should have known that the Fire Defect Vehicles were defective and that the Fire Defect Vehicles could spontaneously ignite when used as intended long before Plaintiffs and the Class. Ford failed to disclose this defect to Plaintiffs and the Class. Thus, enforcement of

the durational limitations on the warranties is harsh and would shock the conscience.

120. Plaintiffs have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiffs. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Fire Defect Vehicles and have no rights under the warranty agreements provided with the Fire Defect Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Fire Defect Vehicles are dangerous instrumentalities due to the aforementioned defect, as spontaneous fires present an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes or other nearby property, passengers, and bystanders.

121. Under 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs under Rule 23 of the Federal Rules of Civil Procedure.

122. Plaintiffs would suffer economic hardship if they returned their Fire Defect Vehicles but did not receive the return of all payments made by them. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiffs have not re-accepted their Fire Defect Vehicles by retaining them.

123. The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of all other Nationwide Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, under 15 U.S.C. § 2310(d)(2), Plaintiffs are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the Nationwide Class members in connection with the commencement and prosecution of this action.

124. Plaintiffs also seek the establishment of a Ford-funded program for Plaintiffs and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Spontaneous Fire Defect in their Fire Defect Vehicles.

## COUNT II

## UNJUST ENRICHMENT
## (COMMON LAW)

**(Alleged by all Plaintiffs on behalf of the Nationwide Class)**

125. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

126. Plaintiffs assert this claim on behalf of themselves and the Nationwide Class, or, in the alternative, on behalf of the state-specific Subclasses. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all the states.

127. This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiffs and the Nationwide Class.

128. Ford has received and retained a benefit from Plaintiffs and Nationwide Class members and inequity has resulted.

129. Ford has benefitted from selling, leasing, and distributing the Fire Defect Vehicles for more than they were worth because of Ford's conduct described herein, at a profit, and Plaintiffs and Nationwide Subclass members have overpaid for the Fire Defect Vehicles and been forced to pay other costs.

130. Thus, Plaintiffs and the Nationwide Subclass conferred a benefit on Ford.

131. It is inequitable for Ford to retain these benefits.

132. Plaintiffs and the Nationwide Subclass were not aware of the true facts about the Fire Defect Vehicles and did not benefit from Ford's conduct described herein.

133. Ford knowingly accepted the benefits of its unjust conduct.

134. As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

**B. State-Specific Claims**

**1. California**

**COUNT III**

**VIOLATION OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (Cal. Civ. Code § 1750, et seq.)**

**(Alleged by Plaintiff Hampton on behalf of the California Subclass)**

135. Plaintiff Hampton and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

136. Plaintiff Hampton brings this claim on behalf of himself and the California Subclass.

137. Ford is a person as defined in California Civil Code § 1761(c).

138. Plaintiff Hampton and the California Subclass members are consumers as defined in California Civil Code § 1761(d).

139. Ford engaged in unfair and deceptive acts in violation of the California Consumer Legal Remedies Act (CLRA) through the practices described

herein, and by omitting the Spontaneous Fire Defect and misrepresenting and misleading Plaintiff Hampton and the California Subclass about the Fire Defect Vehicles, along with omitting the risks, costs, and monetary damage resulting from the Defect. These acts and practices violate, at a minimum, the following sections of the CLRA: (a)(2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (a)(5) representing that goods or services have sponsorships, characteristics, uses, benefits, or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection which they do not have; (a)(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (a)(9) advertising goods and services with the intent not to sell them as advertised.

140. Ford's unfair and deceptive acts or practices occurred repeatedly in its trade or business, were capable of misleading a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

141. Ford knew or should have known that its conduct violated the CLRA.

142. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Hampton and the California Subclass members based on (i) its own pre-sale durability testing;

(ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

143. In the course of its business, Ford violated the CLRA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Hampton and the California Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

144. Ford owed Plaintiff Hampton and the California Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiff Hampton and the California Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Hampton and the California Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

145. In failing to disclose the Spontaneous Fire Defect and the associated safety risks and repair costs that result from it, Ford has misrepresented the Fire Defect Vehicles, omitted disclosure the Spontaneous Fire Defect, and breached its duty to disclose.

146. The facts omitted and misrepresented by Ford to Plaintiff Hampton and California Subclass members, as described herein, are material in that a reasonable consumer would have considered them important in deciding whether to purchase the Fire Defect Vehicles or to pay a lesser price. Had Plaintiff Hampton and California Subclass members known about the defective nature of the Fire Defect Vehicles, they would not have purchased or leased the Subclass Vehicles or would have paid less for them.

147. On or about July 11, 2022, Plaintiff's undersigned counsel provided Ford written notice of their violations of the CLRA under California Civil Code § 1782(a) regarding the Fire Defect Vehicles.

148. Plaintiff Hampton and California Subclass members' injuries were proximately caused by Ford's deceptive business practices.

149. Plaintiff Hampton and California Subclass members seek all relief available under the CLRA, including equitable relief, damages, and attorneys' fees.

## COUNT IV

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200)

## (Alleged by Plaintiff Hampton on behalf of the California Subclass)

150. Plaintiff Hampton and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

151. Plaintiff Hampton brings this claim on behalf of himself and the California Subclass.

152. The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

153. In the course of its business, Ford engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Hampton and the California Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

154. Ford engaged in unfair competition and unfair, unlawful, or fraudulent business practices through the conduct, statements, and omissions described herein, and by omitting the Spontaneous Fire Defect in the Fire Defect Vehicles from Plaintiff Hampton and California Subclass members, along with omitting the risks, costs, and monetary damage resulting from the Defect. Ford should have disclosed this information because it was in a superior position to know the true facts related to the Spontaneous Fire Defect, and Plaintiff Hampton and California Subclass members could not reasonably be expected to learn or discover the true facts related to the Spontaneous Fire Defect.

155. The Spontaneous Fire Defect causes catastrophic fire in the Fire Defect Vehicles, and this constitutes a safety issue that triggered Ford's duty to disclose the safety issue to consumers.

156. Ford's acts and practices mislead and deceived Plaintiff Hampton and are likely to deceive the public. In failing to disclose the Spontaneous Fire Defect and omitting other material facts from Plaintiff Hampton and California Subclass members, Ford breached its duty to disclose these facts, violated the UCL, and caused injuries to Plaintiff Hampton and California Subclass members. Ford's omissions and misrepresentations concerned information that was material to Plaintiff Hampton and California Subclass members, as it would have been to all reasonable consumers.

157. The injuries suffered by Plaintiff Hampton and California Subclass members are not greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff Hampton and California Subclass members could or should have reasonably avoided.

158. Ford's acts and practices are unlawful because they violate California Civil Code §§ 1668, 1709, 1710, and 1750, *et seq.*, and California Commercial Code § 2313. Ford knew or should have known its conduct violated the UCL.

159. Plaintiff Hampton and California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's unfair, unlawful, and deceptive practices.

160. Plaintiff Hampton seeks to enjoin further unlawful, unfair, and fraudulent acts or practices by Ford, to obtain restitutionary disgorgement of all monies and revenues generated because of such practices, and all other relief allowed under California Business & Professions Code § 17200.

**COUNT V**

**VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500, et seq.)**

**(Alleged by Plaintiff Hampton on behalf of the California Subclass)**

161. Plaintiff Hampton and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

162. Plaintiff Hampton brings this claim on behalf of himself and the California Subclass.

163. California Business & Professions Code § 17500 states: "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

164. Ford caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or through the exercise of reasonable care should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff Hampton and the California Subclass members.

165. Ford violated Section 17500 because its misrepresentations and omissions regarding the safety, reliability, and functionality of the Fire Defect Vehicles as described herein were material, untrue, and misleading, and likely to deceive a reasonable consumer.

166. Plaintiff Hampton and the California Subclass members have suffered an injury in fact, including the loss of money or property, because of Ford's deceptive advertising. In purchasing or leasing their Fire Defect Vehicles, Plaintiff Hampton and the California Subclass members relied on Ford's misrepresentations and omissions regarding the safety, reliability, and functionality of the vehicles. Ford's representations and omissions were untrue because the Fire Defect Vehicles were sold or leased with the Spontaneous Fire Defect. Had Plaintiff Hampton and the California Subclass members known this, they would not have purchased or leased their Fire Defect Vehicles or paid as much for them. Accordingly, Plaintiff Hampton and the California Subclass members overpaid for their Fire Defect Vehicles and did not receive the benefit of their bargain.

167. All the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business. Ford's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in California and nationwide.

168. Plaintiff Hampton, individually and on behalf of the California Subclass members, requests this Court enter such orders or judgments as necessary to enjoin Ford from continuing its unlawful and deceptive advertising, to restore to Plaintiff Hampton and the California Subclass members any money Ford acquired

by its deceptive advertising, including restitution and restitutionary disgorgement, and for such other relief permitted.

**COUNT VI**

**VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CALIFORNIA LAW (Cal. Civ. Code §§ 1791.1 & 1792)**

**(Alleged by Plaintiff Hampton on behalf of the California Subclass)**

169. Plaintiff Hampton and the California Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

170. Plaintiff Hampton brings this claim on behalf of himself and the California Subclass.

171. Plaintiff Hampton and the California Subclass members are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

172. The Fire Defect Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

173. Ford is the "manufacturer" of the Fire Defect Vehicles within the meaning of Cal. Civ. Code § 1791(j).

174. Ford impliedly warranted to Plaintiff Hampton and the California Subclass that the Fire Defect Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792; however, the Fire Defect Vehicles do not

have the quality that a buyer would reasonably expect and were therefore not merchantable.

175. Cal. Civ. Code § 1791.1(a) states:

> "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:
>
> (1) Pass without objection in the trade under the contract description.
>
> (2) Are fit for the ordinary purposes for which such goods are used.
>
> (3) Are adequately contained, packaged, and labeled.
>
> (4) Conform to the promises or affirmations of fact made on the container or label.

176. The Fire Defect Vehicles were not merchantable when sold or leased because they contain the Spontaneous Fire Defect and pose an unreasonable risk of fires due to the Spontaneous Fire Defect as described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the Spontaneous Fire Defect that makes the vehicles susceptible to a risk of spontaneous combustion, causing an unreasonable risk of death, serious bodily harm, and property damage to lessees and owners of the Fire Defect Vehicles as well as their homes, passengers, and bystanders. This Defect renders the Fire Defect Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving. In fact, because of the Defect, Ford

specifically advises owners and lessees not to park the vehicles in the vicinity of their homes, structures, or other vehicles.

177. Ford breached the implied warranty of merchantability by selling Fire Defect Vehicles containing a Defect leading to the sudden combustion of the vehicles during ordinary operating conditions, or while parked. This Defect has deprived Plaintiff Hampton and the California Subclass members of the benefit of their bargain.

178. Notice of breach is not required because Plaintiff Hampton and the California Subclass members did not purchase their automobiles directly from Ford. Nonetheless, Plaintiff's counsel sent notification to Ford on or about July 11, 2022.

179. Plaintiff Hampton and the California Subclass members were and are third-party beneficiaries to Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff Hampton and the California Subclass members.

180. As a direct and proximate result Ford's breach of the implied warranty of merchantability, Plaintiff Hampton and the California Subclass members received goods whose dangerous condition now renders them at least partially inoperable and substantially impairs their value. Plaintiff Hampton and the California Subclass members have been damaged as they overpaid for their

vehicles, and now suffer the partial or complete loss of use of their Fire Defect Vehicles.

181. Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiff Hampton and the California Subclass members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Fire Defect Vehicles, or the overpayment or diminution in value of their Fire Defect Vehicles.

182. Under Cal. Civ. Code § 1794, Plaintiff Hampton and the California Subclass members are entitled to costs and attorneys' fees.

### 2. Colorado

## COUNT VII

## VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT (Col. Rev. Stat. § 6-1-101, *et seq.*)

**(Alleged by Plaintiff Swanson on behalf of the Colorado Subclass)**

183. Plaintiff Swanson and the Colorado Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

184. Plaintiff Swanson brings this action on behalf of himself and the Colorado Subclass.

185. Ford is a "person" within the meaning of § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101, *et seq*.

186. Plaintiff Swanson is a "consumer" for purposes of Col. Rev. Stat. § 6-1-113(1)(a).

187. The Colorado CPA prohibits deceptive trade practices in the course of a person's business. Ford engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Fire Defect Vehicles that had the capacity or tendency to deceive Plaintiff Swanson and the Colorado Subclass members; (2) representing that the Fire Defect Vehicles are of a particular standard, quality, and grade even though Ford knew or should have known they are not; (3) advertising the Fire Defect Vehicles with the intent not to sell them as advertised; and (4) failing to disclose material information concerning the Fire Defect Vehicles that was known to Ford at the time of advertisement or sale with the intent to induce Plaintiff Swanson and the Colorado Subclass members to purchase, lease, or retain the Fire Defect Vehicles.

188. In the course of its business, Ford violated the Colorado CPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Swanson and the Colorado Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

189. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiff Swanson and the Colorado Subclass.

190. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Colorado CPA.

191. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the Colorado Subclass, and is material to Plaintiff Swanson.

192. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Swanson and the Colorado Subclass, and did in fact deceive and mislead Plaintiff Swanson.

193. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiff Swanson and the Colorado Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable

consumer acting reasonably under the circumstances, such as Plaintiff Swanson and the Colorado Subclass, and did in fact deceive and mislead Plaintiff Swanson.

194. Plaintiff Swanson could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

195. Ford knew or should have known that its conduct violated the Colorado CPA.

196. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Swanson and the Colorado Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

197. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

198. Ford owed Plaintiff Swanson and the Colorado Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiff Swanson and the Colorado Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Swanson and the Colorado Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

199. Because Ford omitted the Spontaneous Fire Defect, Plaintiff Swanson and the Colorado Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiff Swanson and the Colorado Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

200. Ford's violations of the Colorado CPA present a continuing risk to Plaintiff Swanson, the Colorado Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

201. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff

Swanson and the Colorado Subclass. Had Plaintiff Swanson and the Colorado Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Swanson and the Colorado Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

202. Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiff Swanson and the Colorado Subclass seek monetary relief against Ford measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Colorado Subclass member.

203. Plaintiff Swanson and the Colorado Subclass also seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

## COUNT VIII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER COLORADO LAW (Col. Rev. Stat. § 4-2-314)

**(Alleged by Plaintiff Swanson on behalf of the Colorado Subclass)**

204. Plaintiff Swanson and the Colorado Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

205. Plaintiff Swanson brings this action on behalf of himself and the Colorado Subclass.

206. Ford is a "merchant" of the Fire Defect Vehicles within the meaning of Col. Rev. Stat. § 4-2-104(1) and a "seller" of the Fire Defect Vehicles within the meaning of Col. Rev. Stat. § 4-2-103(d), and the Fire Defect Vehicles are "goods" under Col. Rev. Stat. § 4-2-105(1).

207. Under Colorado law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. Col. Rev. Stat. § 4-2-314.

208. The Fire Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily

harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

209. Plaintiff Swanson and the Colorado Subclass members were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff Swanson and the Colorado Subclass members.

210. It was reasonable to expect that Plaintiff Swanson and the Colorado Subclass would use, consume, or be affected by the Fire Defect Vehicles, and they are therefore entitled to the protections of the implied warranty of merchantability under Col. Rev. Stat. § 4-2-318.

211. Ford was provided notice of these issues within a reasonable time of Plaintiff Swanson's knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel to Ford, consumer complaints to NHTSA and Ford regarding the Defect that is the subject of this Complaint, and by the allegations contained in this and

earlier Complaints. In addition, on or about July 11, 2022, Plaintiff's counsel sent a notice letter to Ford complying with Col. Rev. Stat. § 4-2-607(3)(a), to the extent such notice is required. Because Ford has failed to remedy the Spontaneous Fire Defect within the requisite period, Plaintiff Swanson and the Colorado Subclass seek all damages and other relief to which they are entitled.

212. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Swanson and the Colorado Subclass members have been damaged in an amount to be determined at trial.

### 3. Connecticut

## COUNT IX

## VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT (Conn. Gen. Stat. § 42-110a, *et seq.*)

**(Alleged by Plaintiff Barber on behalf of the Connecticut Subclass)**

213. Plaintiff Barber and the Connecticut Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

214. Plaintiff Barber brings this claim on behalf of himself and the Connecticut Subclass.

215. Ford is a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3). Ford's challenged acts occurred is in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

216. The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). By omitting and misrepresenting the Spontaneous Fire Defect in the Fire Defect Vehicles, Ford participated in unfair and deceptive trade practices that violated the Connecticut UTPA as described herein.

217. In the course of its business, Ford violated the Connecticut UTPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Barber and the Connecticut Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

218. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiff Barber and the Connecticut Subclass.

219. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe

for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Connecticut UTPA.

220. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the Connecticut Subclass, and is material to Plaintiff Barber.

221. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Barber and the Connecticut Subclass, and did in fact deceive and mislead Plaintiff Barber.

222. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiff Barber and the Connecticut Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Barber and the Connecticut Subclass, and did in fact deceive and mislead Plaintiff Barber.

223. Plaintiff Barber could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

224. Ford knew or should have known that its conduct violated the Connecticut UTPA.

225. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Barber and the Connecticut Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

226. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

227. Ford owed Plaintiff Barber and the Connecticut Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiff Barber and the Connecticut Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Barber and the Connecticut Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

228. Because Ford omitted the Spontaneous Fire Defect, Plaintiff Barber and the Connecticut Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiff Barber and the Connecticut Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

229. Ford's violations of the Connecticut UTPA present a continuing risk to Plaintiff Barber, the Connecticut Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

230. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Barber and the Connecticut Subclass. Had Plaintiff Barber and the Connecticut Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Barber and the Connecticut Subclass also suffered ascertainable,

monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

231. Plaintiff Barber and the Connecticut Subclass are entitled to recover their actual damages and attorneys' fees under Conn. Gen. Stat. § 42-110g.

## COUNT X

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER CONNECTICUT LAW (Conn. Gen. Stat. § 42a-2-314)

**(Alleged by Plaintiff Barber on behalf of the Connecticut Subclass)**

232. Plaintiff Barber and the Connecticut Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

233. Plaintiff Barber brings this claim on behalf of himself and the Connecticut Subclass.

234. Ford is a "merchant" within the meaning of Conn. Gen. Stat. § 42a-2-104(1).

235. Under Connecticut law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. Conn. Gen. Stat. § 42a-2-314.

236. The Fire Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same

component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

237. Plaintiff Barber and the Connecticut Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff Barber and the Connecticut Subclass members.

238. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Barber and the Connecticut Subclass have been damaged in an amount to be determined at trial.

### 4. Florida

## COUNT XI

## VIOLATION OF FLORIDA'S UNFAIR & DECEPTIVE TRADE PRACTICES ACT (Fla. Stat. § 501.201, *et seq.*)

**(Alleged by Plaintiffs Stahlman and Caito on behalf of the Florida Subclass)**

239. Plaintiff Stahlman and Caito ("Plaintiffs" for purposes of this claim) and the Florida Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

240. Plaintiffs bring this claim on behalf of themselves and the Florida Subclass.

241. Plaintiffs and the Florida Subclass members are "consumers" within the meaning of the Florida Unfair and Deceptive Trade Practices Act ("FUDTPA"), Fla. Stat. § 501.203(7).

242. Ford engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

243. The FUDTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).

244. By omitting the Spontaneous Fire Defect and misleading Plaintiffs and the Florida Subclass about the Fire Defect Vehicles, Ford participated in unfair

and deceptive trade acts or practices that violated the FUDTPA, as described herein.

245. In the course of its business, Ford violated the FUDTPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiffs and the Florida Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

246. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiffs and the Florida Subclass.

247. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the FUDTPA.

248. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the Florida Subclass, and is material to Plaintiffs.

249. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Florida Subclass, and did in fact deceive and mislead Plaintiffs.

250. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiffs and the Florida Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Florida Subclass, and did in fact deceive and mislead Plaintiffs.

251. Plaintiffs could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

252. Ford knew or should have known that its conduct violated the FUDTPA.

253. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiffs and the Florida Subclass members based on (i) its own pre-sale durability testing; (ii) the direct

and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

254. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

255. Ford owed Plaintiffs and the Florida Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiffs and the Florida Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiffs and the Florida Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

256. Because Ford omitted the Spontaneous Fire Defect, Plaintiffs and the Florida Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiffs and the Florida Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

257. Ford's violations of the FUDTPA present a continuing risk to Plaintiffs, the Florida Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

258. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiffs and the Florida Subclass. Had Plaintiffs and the Florida Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiffs and the Florida Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

259. Because Ford's deceptive acts and practices caused injury to Plaintiffs and the Florida Subclass, they seek and are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1). Plaintiffs and the Florida Subclass also seek an order enjoining Ford's unfair, unlawful, and deceptive practices, declaratory relief, costs, and any other just and proper relief available under the FUDTPA.

## COUNT XII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER FLORIDA LAW (Fla. Stat. § 672.314)

**(Alleged by Plaintiffs Stahlman and Caito on behalf of the Florida Subclass)**

260. Plaintiffs Stahlman and Caito ("Plaintiffs" for purposes of this claim) and the Florida Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

261. Plaintiffs bring this claim on behalf of themselves and the Florida Subclass.

262. Ford is a "merchant" within the meaning of Fla. Stat. § 672.104, and a "seller" of motor vehicles within the meaning of Fla. Stat. § 672.103(d).

263. Under Florida law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. *See* Fla. Stat. § 672.314.

264. The Fire Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as

well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

265. Plaintiffs and the Florida Subclass members were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs and the Florida Subclass members. *See* Fla. Stat. § 672.318.

266. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Florida Subclass have been damaged in an amount to be determined at trial.

### 5. Georgia

## COUNT XIII

## VIOLATION OF GEORGIA'S FAIR BUSINESS PRACTICES ACT (Ga. Code Ann. § 10-1-390, *et seq.*)

**(Alleged by Plaintiffs Hanley and Head on behalf of the Georgia Subclass)**

267. Plaintiffs Hanley and Head ("Plaintiffs" for purposes of this claim) and the Georgia Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

268. Plaintiffs brings this claim on behalf of themselves and the Georgia Subclass.

269. The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code. Ann. § 10-1-393(a), including, but not limited to, "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code. Ann. § 10-1-393(b).

270. In the course of its business, Ford violated the Georgia FBPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiffs and the Georgia Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

271. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiffs and the Georgia Subclass.

272. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Georgia FBPA.

273. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the Georgia Subclass, and is material to Plaintiffs.

274. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Georgia Subclass, and did in fact deceive and mislead Plaintiffs.

275. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiffs and the Georgia Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Georgia Subclass, and did in fact deceive and mislead Plaintiffs.

276. Plaintiffs could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

277. Ford knew or should have known that its conduct violated the Georgia FBPA.

278. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiffs and the Georgia Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

279. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

280. Ford owed Plaintiffs and the Georgia Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiffs and the Georgia Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiffs and the Georgia Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

281. Because Ford omitted the Spontaneous Fire Defect, Plaintiffs and the Georgia Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiffs and the Georgia Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

282. Ford's violations of the Georgia FBPA present a continuing risk to Plaintiffs, the Georgia Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

283. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiffs and the Georgia Subclass. Had Plaintiffs and the Georgia Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiffs and

the Georgia Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

284. Plaintiffs and the Georgia also seek an order enjoining Ford's unfair, unlawful, and deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA under Ga. Code. Ann. § 10-1-399.

285. On or about July 11, 2022, Plaintiffs' counsel sent a letter complying with Ga. Code. Ann § 10-1-399(b). Because Ford failed to remedy its unlawful conduct within the requisite period, Plaintiffs and the Georgia Subclass seek all damages and relief to which they are entitled.

## COUNT XIV

## VIOLATION OF GEORGIA'S UNIFORM DECEPTIVE TRADE PRACTICES ACT (Ga. Code Ann. § 10-1-370, *et seq.*)

**(Alleged by Plaintiffs Hanley and Head on behalf of the Georgia Subclass)**

286. Plaintiffs Hanley and Head ("Plaintiffs" for purposes of this claim) and the Georgia Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

287. Plaintiffs brings this claim on behalf of themselves and the Georgia Subclass.

288. Ford, Plaintiffs, and the Georgia Subclass members are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code Ann. § 10-1-371(5).

289. The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a). By systematically concealing the defects in the Fire Defect Vehicles, Ford engaged in deceptive trade practices prohibited by the Georgia UDTPA.

290. Ford's actions, as set forth herein, occurred in the conduct of trade or commerce.

291. In the course of its business, Ford violated the Georgia UDTPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiffs and the Georgia Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

292. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiffs and the Georgia Subclass.

293. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Georgia UDTPA.

294. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the Georgia Subclass, and is material to Plaintiffs.

295. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Georgia Subclass, and did in fact deceive and mislead Plaintiffs.

296. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiffs and the Georgia Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Georgia Subclass, and did in fact deceive and mislead Plaintiffs.

297. Plaintiffs could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

298. Ford knew or should have known that its conduct violated the Georgia UDTPA.

299. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiffs and the Georgia Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

300. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

301. Ford owed Plaintiffs and the Georgia Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiffs and the Georgia Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiffs and the Georgia Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

302. Because Ford omitted the Spontaneous Fire Defect, Plaintiffs and the Georgia Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiffs and the Georgia Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

303. Ford's violations of the Georgia UDTPA present a continuing risk to Plaintiffs, the Georgia Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

304. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiffs and the Georgia Subclass. Had Plaintiffs and the Georgia Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiffs and

the Georgia Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

305. Plaintiffs and the Georgia Subclass seek an order enjoining Ford's unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA under Ga. Code Ann. § 10-1-373.

**COUNT XV**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER GEORGIA LAW (Ga. Code Ann. § 11-2-314(1))**

**(Alleged by Plaintiffs Hanley and Head on behalf of the Georgia Subclass)**

306. Plaintiffs Hanley and Head ("Plaintiffs" for purposes of this claim) and the Georgia Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

307. Plaintiffs brings this claim on behalf of themselves and the Georgia Subclass.

308. Ford is a "merchant" within the meaning of Ga. Code Ann. § 11-2- and Ga. Code Ann. § 11-2-104(1), and a "seller" of motor vehicles within the meaning of Ga. Code Ann. § 11-2-(103)(1)(d).

309. Under Georgia law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. Ga. Code Ann. § 11-2-314(1).

310. The Fire Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

311. Plaintiffs and the Georgia Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs and the Georgia Subclass members.

312. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Georgia Subclass have been damaged in an amount to be determined at trial.

### 6. Illinois

## COUNT XVI

## VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT (810 ILCS 505/1, *et seq.*, and 720 ILCS 295/1A)

**(Alleged by Plaintiffs Mason and Rezko on behalf of the Illinois Subclass)**

313. Plaintiffs Mason and Rezko ("Plaintiffs" for purposes of this claim) and the Illinois Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

314. Plaintiffs bring this claim on behalf of themselves and the Illinois Subclass.

315. Ford is a "person" as that term is defined in 815 ILCS 505/1(c).

316. Plaintiffs and the Illinois Subclass are "consumers" as that term is defined in 815 ILCS 505/1(e).

317. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

318. In the course of its business, Ford violated the Illinois CFA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiffs and the Illinois Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

319. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiffs and the Illinois Subclass.

320. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Illinois CFA.

321. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the Illinois Subclass, and is material to Plaintiffs.

322. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or

mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Illinois Subclass, and did in fact deceive and mislead Plaintiffs.

323. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiffs and the Illinois Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Illinois Subclass, and did in fact deceive and mislead Plaintiffs.

324. Plaintiffs could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

325. Ford knew or should have known that its conduct violated the Illinois CPA.

326. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiffs and the Illinois Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

327. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

328. Ford owed Plaintiffs and the Illinois Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiffs and the Illinois Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiffs and the Illinois Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

329. Because Ford omitted the Spontaneous Fire Defect, Plaintiffs and the Illinois Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiffs and the Illinois Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

330. Ford's violations of the Illinois CPA present a continuing risk to Plaintiffs, the Illinois Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect.

Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

331. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiffs and the Illinois Subclass. Had Plaintiffs and the Illinois Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiffs and the Illinois Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

332. Under 815 ILCS 505/10a(a), Plaintiffs and the Illinois Subclass seek monetary relief against Ford in the amount of actual damages. Plaintiffs and the Illinois Subclass also seek an order enjoining Ford's unfair and deceptive acts or practices, attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq*.

## COUNT XVII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER ILLINOIS LAW (810 ILCS 5/2-314)

**(Alleged by Plaintiffs Mason and Rezko on behalf of the Illinois Subclass)**

333. Plaintiffs Mason and Rezko ("Plaintiffs" for purposes of this claim) and the Illinois Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

334. Plaintiffs brings this claim on behalf of themselves and the Illinois Subclass.

335. Ford is a "merchant" within the meaning of 810 ILCS 5/2-103(2) and 810 ILCS 5/2-104, and a "seller" of motor vehicles within the meaning of 810 ILCS 5/2-103(1)(d).

336. Under Illinois law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. 810 ILCS 5/2-314.

337. The Fire Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily

harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

338. Plaintiffs and the Illinois Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs and the Illinois Subclass members.

339. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Illinois Subclass have been damaged in an amount to be determined at trial.

### 7. Michigan

## COUNT XVIII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER MICHIGAN LAW (Mich. Comp. Laws § 440.314)

**(Alleged by Plaintiff Mehling on behalf of the Michigan Subclass)**

340. Plaintiff Mehling and the Michigan Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

341. Plaintiff Mehling brings this claim on behalf of himself and the Michigan Subclass.

342. Ford is a "merchant" of motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

343. Under Michigan law, an implied warranty of merchantability attaches to the Fire Defect Vehicles. Mich. Comp. Laws § 440.2314.

344. The Fire Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

345. Plaintiff Mehling and the Michigan Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff Mehling and the Michigan Subclass members.

346. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Mehling and the Michigan Subclass have been damaged in an amount to be determined at trial.

### 8. Montana

**COUNT XIX**

**VIOLATION OF MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT (Mont. Code Ann. § 30-14-101, *et seq.*)**

**(Alleged by Plaintiffs Holm and Ernest on behalf of the Montana Subclass)**

347. Plaintiffs Holm and Ernest ("Plaintiffs" for purposes of this claim) and the Montana Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

348. Plaintiffs bring this action on behalf of themselves and the Montana Subclass.

349. Ford, Plaintiffs, and the Montana Subclass members are "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).

350. Plaintiffs and the Montana Subclass members are "consumer[s]" under Mont. Code Ann. § 30-14-102(1).

351. The sale or lease of the Fire Defect Vehicles to Plaintiffs occurred within "trade and commerce" within the meaning of Mont. Code Ann. § 30-14-102(8), and Ford committed deceptive and unfair acts in the conduct of "trade and commerce" as defined in that statutory section.

352. The Montana Unfair Trade Practices and Consumer Protection Act ("Montana CPA") makes unlawful any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code Ann. § 30-14-103.

353. In the course of its business, Ford violated the Montana CPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiffs and the Montana Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

354. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiffs and the Montana Subclass.

355. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Montana CPA.

356. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the Montana Subclass, and is material to Plaintiffs.

357. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Montana Subclass, and did in fact deceive and mislead Plaintiffs.

358. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiffs and the Montana Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Montana Subclass, and did in fact deceive and mislead Plaintiffs.

359. Plaintiffs and the Montana Subclass could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility

for the Spontaneous Fire Defect, until shortly before this class action was commenced.

360. Ford knew or should have known that its conduct violated the Montana CPA.

361. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiffs and the Montana Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

362. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

363. Ford owed Plaintiffs and the Montana Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiffs and the Montana Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiffs and the Montana Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

364. Because Ford omitted the Spontaneous Fire Defect, Plaintiffs and the Montana Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiffs and the Montana Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

365. Ford's violations of the Montana CPA present a continuing risk to Plaintiffs, the Montana Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

366. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiffs and the Montana Subclass. Had Plaintiffs and the Montana Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiffs and

the Montana Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

367. Because Ford's unlawful methods, acts, and practices have caused Plaintiffs and the Montana Subclass to suffer an ascertainable loss of money and property, they seek from Ford actual damages or $500, whichever is greater, discretionary treble damages, reasonable attorneys' fees, an order enjoining Ford's unfair, unlawful, and deceptive practices, and any other relief the Court considers necessary or proper, under Mont. Code Ann. § 30-14-133.

**COUNT XX**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Mont. Code Ann. § 30-2-314)**

**(Alleged by Plaintiffs Holm and Ernest on behalf of the Montana Subclass)**

368. Plaintiffs Holm and Ernest ("Plaintiffs" for purposes of this claim) and the Montana Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

369. Plaintiffs bring this action on behalf of themselves and the Montana Subclass.

370. Ford was a merchant with respect to motor vehicles under Mont. Code Ann. § 30-2-104(1).

371. Under Mont. Code Ann. § 30-2-314, a warranty that the Fire Defect Vehicles were in merchantable condition was implied by law in the transactions

when Plaintiffs and the Montana Subclass members purchased or leased their Fire Defect Vehicles from Ford.

372. The Fire Defect Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Fire Defect Vehicles are inherently defective because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

373. Plaintiffs and the Montana Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs and the Montana Subclass members.

374. Ford was provided notice of these issues within a reasonable time of Plaintiffs and the Montana Subclass members' knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel to Ford, consumer complaints to NHTSA regarding the Defect that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

375. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Montana Subclass have been damaged in an amount to be determined at trial.

**9. New Mexico**

**COUNT XXI**

**VIOLATION OF THE NEW MEXICO UNFAIR TRADE PRACTICES ACT (N.M. Stat. Ann. §§ 57-12-1, *et seq.*)**

**(Alleged by Plaintiff Mammel on behalf of the New Mexico Subclass)**

376. Plaintiff Mammel and the New Mexico Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

377. Plaintiff Mammel brings this action on behalf of herself and the New Mexico Subclass.

378. Ford, Plaintiff Mammel, and the New Mexico Subclass members are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. Stat. Ann. § 57-12-2.

379. Ford's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

380. The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D). Ford's acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. Stat. Ann. § 57-12-2(D).

381. By omitting the Spontaneous Fire Defect and misleading Plaintiff Mammel and the New Mexico Subclass about the Fire Defect Vehicles, Ford participated in unfair and deceptive trade acts or practices that violated the New Mexico UTPA, as described herein.

382. In the course of its business, Ford violated the New Mexico UTPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Mammel and the New Mexico Subclass members. Ford also

mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

383. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiff Mammel and the New Mexico Subclass.

384. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the New Mexico UTPA.

385. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the New Mexico Subclass, and is material to Plaintiff Mammel.

386. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Mammel and the New Mexico Subclass, and did in fact deceive and mislead Plaintiff Mammel.

387. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiff Mammel and the New Mexico Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire

Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Mammel and the New Mexico Subclass, and did in fact deceive and mislead Plaintiff Mammel.

388. Plaintiff Mammel could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

389. Ford knew or should have known that its conduct violated the New Mexico UTPA.

390. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Mammel and the New Mexico Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

391. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

392. Ford owed Plaintiff Mammel and the New Mexico Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing Plaintiff Mammel and the New Mexico Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Mammel and the New Mexico Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

393. Because Ford omitted the Spontaneous Fire Defect, Plaintiff Mammel and the New Mexico Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiff Mammel and the New Mexico Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

394. Ford's violations of the New Mexico UTPA present a continuing risk to Plaintiff Mammel, the New Mexico Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

395. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Mammel and the New Mexico Subclass. Had Plaintiff Mammel and the New Mexico Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Mammel and the New Mexico Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

396. Because Ford's misconduct caused actual harm to Plaintiff Mammel and the New Mexico Subclass, they seek recovery of actual damages or $100, whichever is greater, discretionary treble damages, punitive damages, and reasonable attorneys' fees and costs, as well as all other proper and just relief available under N.M. Stat. Ann. § 57-12-10.

**COUNT XXII**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.M. Stat. Ann. § 55-2-314)**

**(Alleged by Plaintiff Mammel on behalf of the New Mexico Subclass)**

397. Plaintiff Mammel and the New Mexico Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

398. Plaintiff Mammel brings this action on behalf of herself and the New Mexico Subclass.

399. Ford was a merchant with respect to motor vehicles under N.M. Stat. Ann. § 55-2-104(1).

400. Under N.M. Stat. Ann. § 55-2-314, a warranty that the Fire Defect Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff Mammel and the New Mexico Subclass members purchased or leased their Fire Defect Vehicles from Ford.

401. The Fire Defect Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Fire Defect Vehicles are inherently defective because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of

the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

402. Plaintiff Mammel and the New Mexico Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff Mammel and the New Mexico Subclass members.

403. Ford was provided notice of these issues within a reasonable time of Plaintiff Mammel and the New Mexico Subclass members' knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel to Ford, consumer complaints to NHTSA regarding the Defect that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

404. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Mammel and the New Mexico Subclass have been damaged in an amount to be determined at trial.

**10. New York**

**COUNT XXIII**

**VIOLATION OF NEW YORK'S DECEPTIVE ACTS AND PRACTICES (N.Y. Gen. Bus. Law § 349, *et seq.*)**

(Alleged by Plaintiff Sessler on behalf of the New York Subclass)

405. Plaintiff Sessler and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

406. Plaintiff Sessler brings this action on behalf of himself and the New York Subclass.

407. Plaintiff Sessler and the New York Subclass members are "persons" within the meaning of New York General Business Law ("NYGBL"), N.Y. Gen. Bus. Law § 349(h).

408. Ford is a "person," "firm," "corporation," or "association" within the meaning of NYGBL Section 349.

409. NYGBL Section 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce, or in the furnishing of any service in this state ..." Material omissions are also actionable under NYGBL § 349.

410. By omitting the Spontaneous Fire Defect and misleading Plaintiff Sessler and the New York Subclass about the Fire Defect Vehicles, Ford's conduct

described herein constitutes "deceptive acts or practices" within the meaning of the NYGBL.

411. In the course of its business, Ford violated NYGBL Section 349 and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Sessler and the New York Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

412. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiff Sessler and the New York Subclass.

413. Ford knew or should have known that its conduct violated the NYGBL.

414. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Sessler and the New York Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

415. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the New York Subclass, and is material to Plaintiff Sessler.

416. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Sessler and the New York Subclass, and did in fact deceive and mislead Plaintiff Sessler.

417. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiff Sessler and the New York Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Sessler and the New York Subclass, and did in fact deceive and mislead Plaintiff Sessler.

418. Plaintiff Sessler could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

419. As alleged above, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

420. Ford owed Plaintiff Sessler and the New York Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiff Sessler and the New York Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Sessler and the New York Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

421. Because Ford omitted the Spontaneous Fire Defect, Plaintiff Sessler and the New York Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiff Sessler and the New York Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

422. Ford's violations of the NYGBL present a continuing risk to Plaintiff Sessler, the New York Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there

is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

423. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Sessler and the New York Subclass. Had Plaintiff Sessler and the New York Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Sessler and the New York Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

424. Because Ford's deceptive acts and practices caused injury to Plaintiff Sessler and the New York Subclass, they seek monetary relief against Ford in the greater amount of actual damages or statutory damages, and reasonable attorneys' fees and costs. Plaintiff Sessler and the New York Subclass also seek an order enjoining Ford's unlawful practices and any other just and proper relief available under NYGBL Section 349.

## COUNT XXIV

## VIOLATION OF NEW YORK'S FALSE ADVERTISING ACT (N.Y. Gen. Bus. Law § 350)

**(Alleged by Plaintiff Sessler on behalf of the New York Subclass)**

425. Plaintiff Sessler and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

426. Plaintiff Sessler brings this action on behalf of himself and the New York Subclass.

427. Ford was and is engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

428. New York's General Business Law ("NYGBL") Section 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity. . . ." N.Y. Gen. Bus. Law § 350-a.

429. Ford caused to be made or disseminated through New York, through representations, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care

should have been known to Ford, to be untrue and misleading to consumers, including Plaintiff Sessler and the New York Subclass members.

430. Ford violated NYGBL Section 350 because it omitted facts regarding the Spontaneous Fire Defect and misrepresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles to Plaintiff Sessler and New York Subclass members, as alleged herein, which were material omissions and misrepresentations and likely to deceive a reasonable consumer, such as Plaintiff Sessler and New York Subclass members.

431. Plaintiff Sessler and the New York Subclass suffered injury, including the loss of money or property, because of Ford's false advertising. In purchasing or leasing their Fire Defect Vehicles, Plaintiff Sessler and the New York Subclass members relied on Ford's misrepresentations and omissions regarding the safety, quality, functionality, and reliability of the Fire Defect Vehicles. Had Plaintiff Sessler and the New York Subclass members known about the Spontaneous Fire Defect, they would not have purchased or leased their Fire Defect Vehicles or paid as much for them. Plaintiff Sessler and the New York Subclass also suffered ascertainable monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

432. Under NYGBL Section 350, Plaintiff Sessler and the New York Subclass seek monetary relief against Ford in the greater amount of actual damages

or statutory damages. Plaintiff Sessler and the New York Subclass also seek an order enjoining Ford's unlawful practices, attorneys' fees, costs, and any other just and proper relief available under NYGBL Section 350.

**COUNT XXV**

**BREACH OF NEW YORK'S IMPLIED WARRANTY OF MERCHANTABILITY (N.Y. U.C.C. Law §§ 2-314; 2A-212)**

**(Alleged by Plaintiff Sessler on behalf of the New York Subclass)**

433. Plaintiff Sessler and the New York Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

434. Plaintiff Sessler brings this action on behalf of himself and the New York Subclass.

435. Ford is a "merchant[]" and "seller[]" of motor vehicles, and the Fire Defect Vehicles are "goods" under New York law. *See* N.Y. U.C.C. § 2-104(1).

436. Under N.Y. U.C.C. §§ 2-314; 2A-212, an implied warranty of merchantability attaches to the Fire Defect Vehicles when they were sold or leased by Ford to Plaintiff Sessler and the New York Subclass members.

437. The Fire Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same

component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

438. Plaintiff Sessler and the New York Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff Sessler and the New York Subclass members.

439. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Sessler and the New York Subclass have been damaged in an amount to be determined at trial.

### 11. North Carolina

## COUNT XXVI

## VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. Gen. Stat. § 75-1.1, *et seq.*)

**(Alleged by Plaintiff Smith on behalf of the North Carolina Subclass)**

440. Plaintiff Smith and the North Carolina Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

441. Plaintiff Smith brings this action on behalf of himself and the North Carolina Subclass.

442. Ford engaged in "commerce" within the meaning of N.C. GEN. STAT. § 75-1.1(b).

443. N.C. Gen. Stat. § 75-1.1, *et seq.* (the "North Carolina Act") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." As alleged herein, Ford committed unfair or deceptive acts or practices in violation of the North Carolina Act.

444. In the course of its business, Ford violated the North Carolina Act and engaged in unfair and deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Smith and the North Carolina Subclass

members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

445. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiff Smith and the North Carolina Subclass.

446. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the North Carolina Act.

447. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the North Carolina Subclass, and is material to Plaintiff Smith.

448. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Smith and the North Carolina Subclass, and did in fact deceive and mislead Plaintiff Smith.

449. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiff Smith and the North Carolina Subclass, were unaware.

Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Smith and the North Carolina Subclass, and did in fact deceive and mislead Plaintiff Smith.

450. Plaintiff Smith could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

451. Ford knew or should have known that its conduct violated the North Carolina Act.

452. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Smith and the North Carolina Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

453. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

454. Ford owed Plaintiff Smith and the North Carolina Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiff Smith and the North Carolina Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Smith and the North Carolina Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

455. Because Ford omitted the Spontaneous Fire Defect, Plaintiff Smith and the North Carolina Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiff Smith and the North Carolina Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

456. Ford's violations of the North Carolina Act present a continuing risk to Plaintiff Smith, the North Carolina Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

457. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Smith and the North Carolina Subclass. Had Plaintiff Smith and the North Carolina Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Smith and the North Carolina Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

458. Because Ford's deceptive acts and practices caused injury to Plaintiff Smith and the North Carolina Subclass, they seek an order for treble their actual damages, an order enjoining Ford's unlawful acts, costs, attorney's fees, and any other just and proper relief available under the North Carolina Act.

## COUNT XXVII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (N.C. Gen. Stat. § 25-2-314)

**(Alleged by Plaintiff Smith on behalf of the North Carolina Subclass)**

459. Plaintiff Smith and the North Carolina Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

460. Plaintiff Smith brings this action on behalf of himself and the North Carolina Subclass.

461. Ford is a merchant with respect to motor vehicles within the meaning of N.C. Gen. Stat. § 25-2-104(1).

462. Under N.C. Gen. Stat. § 25-2-314, a warranty that the Fire Defect Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff Smith and the North Carolina Subclass purchased or leased their Fire Defect Vehicles from Ford.

463. The Fire Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

464. Plaintiff Smith and the North Carolina Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff Smith and the North Carolina Subclass members.

465. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Smith and the North Carolina Subclass have been damaged in an amount to be determined at trial.

### 12. Ohio

**COUNT XXVIII**

**VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT (Ohio Rev. Code § 1345.01, *et seq.*)**

**(Alleged by Plaintiff Machanja on behalf of the Ohio Subclass)**

466. Plaintiff Machanja and the Ohio Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

467. Plaintiff Machanja brings this action on behalf of himself and the Ohio Subclass.

468. Ford is a "supplier" as that term is defined in Ohio Rev. Code § 1345.01(C).

469. Plaintiff Machanja and the Ohio Subclass members are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchases and

leases of the Fire Defect Vehicles are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

470. The Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code § 1345.02 *et seq.*, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Ohio CSPA prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not. *Id.* Ford's conduct as alleged herein constitutes unfair and/or deceptive consumer sales practices in violation of Ohio Rev. Code § 1345.02.

471. By devaluing safety and omitting the Spontaneous Fire Defect, Ford engaged in deceptive business practices prohibited by the Ohio CSPA, including: representing that Fire Defect Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that vehicles are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving Fire Defect Vehicles has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

472. In the course of its business, Ford violated the Ohio CSPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Machanja and the Ohio Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

473. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiff Machanja and the Ohio Subclass.

474. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Ohio CSPA.

475. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the Ohio Subclass, and is material to Plaintiff Machanja.

476. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as

Plaintiff Machanja and the Ohio Subclass, and did in fact deceive and mislead Plaintiff Machanja.

477. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiff Machanja and the Ohio Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Machanja and the Ohio Subclass, and did in fact deceive and mislead Plaintiff Machanja.

478. Plaintiff could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

479. Ford knew or should have known that its conduct violated the Ohio CSPA.

480. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Machanja and the Ohio Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

481. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

482. Ford owed Plaintiff Machanja and the Ohio Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiff Machanja and the Ohio Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Machanja and the Ohio Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

483. Because Ford omitted the Spontaneous Fire Defect, Plaintiff Machanja and the Ohio Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiff Machanja and the Ohio Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

484. Ford's violations of the Ohio CSPA present a continuing risk to Plaintiff Machanja, the Ohio Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

485. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Machanja and the Ohio Subclass. Had Plaintiff Machanja and the Ohio Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Machanja and the Ohio Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

486. Plaintiff Machanja and the Ohio Subclass specifically do not allege herein a claim for violation of Ohio Rev. Code § 1345.72.

487. Ford was on notice pursuant to Ohio Rev. Code § 1345.09(B) that its actions constituted unfair, deceptive, and unconscionable practices by, for example, *Mason v. Mercedes-Benz USA, LLC*, 2005 Ohio App. LEXIS 3911, at

*33 (S.D. Ohio Aug. 18, 2005), and *Lilly v. Hewlett-Packard Co.*, 2006 U.S. Dist. LEXIS 22114, at *17-18 (S.D. Ohio Apr. 21, 2006). Further, Ford's conduct as alleged above constitutes an act or practice previously declared to be deceptive or unconscionable by rule adopted under division (B)(2) of section 1345.05 and previously determined by Ohio courts to violate Ohio's Consumer Sales Practices Act and was committed after the decisions containing these determinations were made available for public inspection under division (A)(3) of Ohio Rev. Code § 1345.05. The applicable rule and Ohio court opinions include but are not limited to: OAC 109:4-3-16; *Mason v. Mercedes-Benz USA, LLC*, 2005 Ohio 4296 (Ohio Ct. App. 2005); *Khouri v. Lewis*, Cuyahoga Common Pleas No. 342098 (2001); *State ex rel. Montgomery v. Canterbury*, Franklin App. No. 98CVH054085 (2000); and *Fribourg v. Vandemark* (July 26, 1999), Clermont App. No. CA99-02-017, unreported (PIF # 10001874).

488. As a result of the foregoing wrongful conduct of Ford, Plaintiff Machanja and the Ohio Subclass have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Ford's deceptive and unfair conduct, treble damages, court costs and reasonable attorneys' fees, pursuant to Ohio Rev. Code § 1345.09, *et seq.*

## COUNT XXIX

## IMPLIED WARRANTY IN TORT UNDER OHIO LAW

## (Alleged by Plaintiff Machanja on behalf of the Ohio Subclass)

489. Plaintiff Machanja and the Ohio Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

490. Plaintiff Machanja brings this action on behalf of himself and the Ohio Subclass.

491. The Fire Defect Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars are used.

492. The Fire Defect Vehicles are inherently defective because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the

Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

493. The design, manufacturing, and/or assembly Defect existed at the time the Fire Defect Vehicles containing the Spontaneous Fire Defect left the possession or control of Ford.

494. Based upon the dangerous product defect, Ford failed to meet the expectations of a reasonable consumer. The Fire Defect Vehicles failed their ordinary, intended use because the vehicles contain the Spontaneous Fire Defect and therefore do not function as a reasonable consumer would expect. Moreover, the Defect presents a serious danger to Plaintiff Machanja and the Ohio Subclass members that cannot be eliminated without significant cost and extreme inconvenience.

495. Ford was provided notice of the Spontaneous Fire Defect and its consequences by pre-sale investigation, complaints made to NHTSA, and internal investigations before or within a reasonable amount of time after Ford issued the recall and the allegations of the Defect became public.

496. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Machanja and the Ohio Subclass have been damaged in an amount to be proven at trial.

### 13. Oklahoma

**COUNT XXX**

**VIOLATION OF OKLAHOMA'S CONSUMER PROTECTION ACT**
**(Okla. Stat. Tit. 15 § 751, *et seq.*)**

**(Alleged by Plaintiff Kuhn on behalf of the Oklahoma Subclass)**

497. Plaintiff Kuhn and the Oklahoma Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

498. Plaintiff Kuhn brings this action on behalf of herself and the Oklahoma Subclass.

499. The Oklahoma Consumer Protection Act ("Oklahoma CPA") prohibits, in the course of business: "mak[ing] a false or misleading representation, knowingly or with reason to know, as to the characteristics …, uses, [or] benefits, of the subject of a consumer transaction," or making a false representation, "knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another or "[a]dvertis[ing], knowingly or with reason to know, the subject of a consumer transaction with intent not to sell it as advertised;" and otherwise committing "an unfair or deceptive trade practice." Okla. Stat. Tit. 15 § 753.

500. In the course of its business, Ford violated the Oklahoma CPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts

concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Kuhn and the Oklahoma Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

501. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiff Kuhn and the Oklahoma Subclass.

502. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Oklahoma CPA.

503. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the Oklahoma Subclass, and is material to Plaintiff Kuhn.

504. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Kuhn and the Oklahoma Subclass, and did in fact deceive and mislead Plaintiff Kuhn.

505. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiff Kuhn and the Oklahoma Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Kuhn and the Oklahoma Subclass, and did in fact deceive and mislead Plaintiff Kuhn.

506. Plaintiff could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

507. Ford knew or should have known that its conduct violated the Oklahoma CPA.

508. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Kuhn and the Oklahoma Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

509. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

510. Ford owed Plaintiff Kuhn and the Oklahoma Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiff Kuhn and the Oklahoma Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Kuhn and the Oklahoma Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

511. Because Ford omitted the Spontaneous Fire Defect, Plaintiff Kuhn and the Oklahoma Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiff Kuhn and the Oklahoma Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

512. Ford's violations of the Oklahoma CPA present a continuing risk to Plaintiff Kuhn, the Oklahoma Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and

so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

513. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Kuhn and the Oklahoma Subclass. Had Plaintiff Kuhn and the Oklahoma Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Kuhn and the Oklahoma Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

514. Under Okla. Stat. Tit. 15 § 761.1, Plaintiff Kuhn and the Oklahoma Subclass seek an order enjoining Ford's unfair and/or deceptive acts or practices, damages, attorneys' fees, costs, and any other just and proper relief available under the Oklahoma CPA.

**COUNT XXXI**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Okla. Stat. Tit. 12A §§ 2-314 and 2A-212)**

**(Alleged by Plaintiff Kuhn on behalf of the Oklahoma Subclass)**

515. Plaintiff Kuhn and the Oklahoma Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

516. Plaintiff Kuhn brings this action on behalf of herself and the Oklahoma Subclass.

517. Ford is and was at all relevant times a merchant with respect to motor vehicles.

518. A warranty that the Fire Defect Vehicles were in merchantable condition is implied by law in the instant transactions. These Fire Defect Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Fire Defect Vehicles are inherently defective because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

519. Plaintiff Kuhn and the Oklahoma Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff Kuhn and the Oklahoma Subclass members.

520. Ford was provided notice of these issues within a reasonable time of Plaintiff Kuhn and the Oklahoma Subclass members' knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiff's counsel to Ford, consumer complaints to NHTSA regarding the Defect that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

521. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Kuhn and the Oklahoma Subclass have been damaged in an amount to be determined at trial.

**14. Oregon**

**COUNT XXXII**

**VIOLATION OF THE OREGON UNLAWFUL TRADE PRACTICES ACT (Or. Rev. Stat. §§ 646.605, *et seq.*)**

**(Alleged by Plaintiff Rich on behalf of the Oregon Subclass)**

522. Plaintiff Rich and the Oregon Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

523. Plaintiff Rich brings this action on behalf of himself and the Oregon Subclass.

524. Ford is a person within the meaning of Or. Rev. Stat. § 646.605(4).

525. The Fire Defect Vehicles at issue are "goods" obtained primarily for personal family or household purposes within the meaning of Or. Rev. Stat. § 646.605(6).

526. The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following: "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, … or qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; (i) Advertis[ing] … goods or services with intent not to provide them as advertised;" and "(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce." Or. Rev. Stat. § 646.608(1).

527. Ford engaged in deceptive trade practices that violated the Oregon UTPA, including: knowingly representing that Fire Defect Vehicles have uses and benefits which they do not have; representing that Fire Defect Vehicles are of a particular standard, quality, and grade when they are not; advertising Fire Defect Vehicles with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving Fire Defect Vehicles has been supplied in

accordance with a previous representation when it has not; knowingly making other false representations in a transaction; and concealing the known Spontaneous Fire Defect in Plaintiff Rich and the Oregon Subclass members' vehicles.

528. In the course of its business, Ford violated the Oregon UTPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiff Rich and the Oregon Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

529. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiff Rich and the Oregon Subclass.

530. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Oregon UTPA.

531. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the Oregon Subclass, and is material to Plaintiff Rich.

532. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Rich and the Oregon Subclass, and did in fact deceive and mislead Plaintiff Rich.

533. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiff Rich and the Oregon Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiff Rich and the Oregon Subclass, and did in fact deceive and mislead Plaintiff Rich.

534. Plaintiff could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

535. Ford knew or should have known that its conduct violated the Oregon UTPA.

536. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Rich and the Oregon Subclass members based on (i) its own pre-sale durability testing; (ii) the

direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

537. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

538. Ford owed Plaintiff Rich and the Oregon Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiff Rich and the Oregon Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Rich and the Oregon Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

539. Because Ford omitted the Spontaneous Fire Defect, Plaintiff Rich and the Oregon Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiff Rich and the Oregon Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

540. Ford's violations of the Oregon UTPA present a continuing risk to Plaintiff Rich, the Oregon Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

541. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Rich and the Oregon Subclass. Had Plaintiff Rich and the Oregon Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Rich and the Oregon Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

542. Plaintiff Rich and the Oregon Subclass are entitled to recover the greater of actual damages or $200 under to Or. Rev. Stat. § 646.638(1).

## COUNT XXXIII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER OREGON LAW (Or. Rev. Stat. §72.3140)

**(Alleged by Plaintiff Rich on behalf of the Oregon Subclass)**

543. Plaintiff Rich and the Oregon Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

544. Plaintiff Rich brings this action on behalf of himself and the Oregon Subclass.

545. Ford is a "merchant" within the meaning of Or. Rev. Stat. § 72.1040(1), and "seller" of motor vehicles within the meaning of Or. Rev. Stat. § 72.1030(1)(d).

546. The Fire Defect Vehicles are "goods" under Or. Rev. Stat. § 72.5010 (see Or. Rev. Stat. § 72.1030(2)(m)). Under Or. Rev. Stat. § 72.3140, an implied warranty of merchantability attaches to the Fire Defect Vehicles.

547. The Fire Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily

harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

548. Plaintiff Rich and the Oregon Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiff Rich and the Oregon Subclass members.

549. Ford was provided notice of these issues within a reasonable time of Plaintiff Rich and the Oregon Subclass members' knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by consumer complaints to NHTSA regarding the Defect, and by the allegations in this and earlier Complaints. In addition, Plaintiff's counsel sent notice letters to Ford to the extent such notice is required. Ford has failed to remedy the Spontaneous Fire Defect within the requisite period. Plaintiff Rich and the Oregon Subclass seek all damages and relief to which they are entitled.

550. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiff Rich and the Oregon Subclass have been damaged in an amount to be determined at trial.

**15. Pennsylvania**

**COUNT XXXIV**

**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, *et seq.*)**

**(Alleged by Plaintiff Sulligan on behalf of the Pennsylvania Subclass)**

551. Plaintiff Sulligan and the Pennsylvania Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

552. Plaintiff Sulligan brings this action on behalf of herself and the Pennsylvania Subclass.

553. Plaintiff Sulligan and the Pennsylvania Subclass members purchased or leased their Fire Defect Vehicles primarily for personal, family, or household purposes within the meaning of 73 P.S. § 201-9.2.

554. All of the acts complained of herein were perpetrated by Ford in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

555. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have;" (ii) "Representing that goods or

services are of a particular standard, quality or grade … if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

556. Ford engaged in unlawful trade practices, including representing that Fire Defect Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that Fire Defect Vehicles are of a particular standard and quality when they are not; advertising Fire Defect with the intent not to sell them as advertised; and engaging in other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

557. In purchasing or leasing the Fire Defect Vehicles, Plaintiff Sulligan and the Pennsylvania Subclass were deceived by Ford's failure to disclose the Spontaneous Fire Defect and misrepresentations about the Fire Defect Vehicles.

558. Plaintiff Sulligan and the Pennsylvania Subclass members reasonably relied on Ford's material omissions and false misrepresentations. They had no way of knowing that Ford's representations were false and gravely misleading. Plaintiff Sulligan and the Pennsylvania Subclass members did not, and could not, unravel Ford's deception on their own.

559. Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, such as Plaintiff Sulligan and the Pennsylvania Subclass members.

560. Ford knew or should have known that its conduct violated the Pennsylvania CPL.

561. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiff Sulligan and the Pennsylvania Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

562. Ford owed Plaintiff Sulligan and the Pennsylvania Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiff Sulligan and the Pennsylvania Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiff Sulligan and the Pennsylvania Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

563. Ford had a duty to disclose the Spontaneous Fire Defect, because, having volunteered to provide information to Plaintiff Sulligan and the Pennsylvania Subclass, Ford had the duty to disclose not just the partial truth, but the entire truth. Further, Plaintiffs relied on Ford's material omissions and representations that the Fire Defect Vehicles they were purchasing safe and free from serious safety defects.

564. Plaintiff Sulligan and the Pennsylvania Subclass were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the omitted facts, in that they would not have purchased or leased the Fire Defect Vehicles manufactured by Ford, would have paid less, and would have taken other affirmative steps considering the information omitted from them. Plaintiff Sulligan and the Pennsylvania Subclass members' actions were justified. Ford was in exclusive control of the material facts, and such facts were not generally known to the public or Plaintiff Sulligan and the Pennsylvania Subclass.

565. Ford's violations of the Pennsylvania CPL present a continuing risk to Plaintiff Sulligan, the Pennsylvania Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or

around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

566. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiff Sulligan and the Pennsylvania Subclass. Had Plaintiff Sulligan and the Pennsylvania Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiff Sulligan and the Pennsylvania Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

567. Ford is liable to Plaintiff Sulligan and the Pennsylvania Subclass for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a).

## COUNT XXXV

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY UNDER PENNSYLVANIA LAW (13 Pa. Cons. Stat. Ann. § 2314)

**(Alleged by Plaintiff Sulligan on behalf of the Pennsylvania Subclass)**

568. Plaintiff Sulligan and the Pennsylvania Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

569. Plaintiff Sulligan brings this action on behalf of herself and the Pennsylvania Subclass.

570. Ford is a "merchant" with respect to motor vehicles.

571. Under Pennsylvania law, an implied warranty of merchantability attaches to the Fire Defect Vehicles.

572. The Fire Defect Vehicles were not merchantable when sold or leased because they are prone to a spontaneous and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

573. Plaintiff Sulligan and the Pennsylvania Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who

sold or leased the Fire Defect Vehicles to Plaintiff Sulligan and the Pennsylvania Subclass members.

574. It was reasonable to expect that Plaintiff Sulligan and the Pennsylvania Subclass members would use, consume, or be affected by the Fire Defect Vehicles.

575. Ford was provided notice of these issues within a reasonable time of Plaintiff Sulligan and the Pennsylvania Subclass members' knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel to Ford, consumer complaints to NHTSA regarding the Defect that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

576. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs have been damaged in an amount to be determined at trial.

## 16. Texas

### COUNT XXXVI

### VIOLATION OF TEXAS'S DECEPTIVE TRADE PRACTICES ACT (Tex. Bus. & Com. Code §§ 17.41, *et seq.*)

### (Alleged by Plaintiffs Romo, Huntley, and Amores on behalf of the Texas Subclass)

577. Plaintiffs Romo, Huntley, and Amores ("Plaintiffs" for purposes of this claim) and the Texas Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

578. Plaintiffs bring this action on behalf of themselves and the Texas Subclass.

579. Plaintiffs and the Texas Subclass are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" under Tex. Bus. & Com. Code § 17.45(4).

580. Ford is a "person" within the meaning of Tex. Bus. & Com. Code § 17.45(3).

581. Ford's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of Tex. Bus. & Com. Code § 17.46(A).

582. The Texas Deceptive Trade Practices Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or

commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3).

583. In the course of its business, Ford violated the Texas DTPA and engaged in deceptive acts or practices with the marketing and sale or lease of the Fire Defect Vehicles because it misrepresented and omitted material facts concerning the Fire Defect Vehicles, specifically the existence of the Spontaneous Fire Defect, as alleged herein. Ford omitted the fact of the Spontaneous Fire Defect from Plaintiffs and the Texas Subclass members. Ford also mispresented the safety, quality, functionality, and reliability of the Fire Defect Vehicles given the existence of the Spontaneous Fire Defect in them.

584. Ford's actions described herein occurred in the conduct of trade or commerce, specifically the sale or lease of the Fire Defect Vehicles to Plaintiffs and the Texas Subclass.

585. By failing to disclose and omitting the Spontaneous Fire Defect in the Fire Defect Vehicles, which it marketed as safe, reliable, of high quality, and safe for ordinary use, Ford engaged in unfair and deceptive business practices in violation of the Texas DTPA.

586. The Spontaneous Fire Defect would be material to a reasonable consumer, such as the Texas Subclass, and is material to Plaintiffs.

587. Ford's deceptive act or practices described herein concerning the Spontaneous Fire Defect and the Fire Defect Vehicles were likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Texas Subclass, and did in fact deceive and mislead Plaintiffs.

588. Ford failed to disclose material information about the Spontaneous Fire Defect and the Fire Defect Vehicles, which Ford possessed and of which consumers, like Plaintiffs and the Texas Subclass, were unaware. Ford's failure to disclose this material information about the Spontaneous Fire Defect and the Fire Defect Vehicles was likely to deceive or mislead a reasonable consumer acting reasonably under the circumstances, such as Plaintiffs and the Texas Subclass, and did in fact deceive and mislead Plaintiffs.

589. Plaintiffs could not have discovered the existence of the Spontaneous Fire Defect, or Ford's deception and responsibility for the Spontaneous Fire Defect, until shortly before this class action was commenced.

590. Ford knew or should have known that its conduct violated the Texas DTPA.

591. Ford knew or should have known about the Spontaneous Fire Defect affecting the Fire Defect Vehicles owned or leased by Plaintiffs and the Texas

Subclass members based on (i) its own pre-sale durability testing; (ii) the direct and public reports of fires in twenty-one Fire Defect Vehicles; and (iii) Ford's own investigation of fires in the Fire Defect Vehicles.

592. As alleged herein, Ford made material statements about the safety, functionality, quality, and reliability of the Fire Defect Vehicles that were either false or misleading.

593. Ford owed Plaintiffs and the Texas Subclass a duty to disclose the true safety and reliability of the Fire Defect Vehicles because Ford:

a. Possessed exclusive knowledge about the Spontaneous Fire Defect;

b. Omitted the foregoing from Plaintiffs and the Texas Subclass;

c. Made misleading and incomplete representations about the safety, quality, functionality, and reliability of the Fire Defect Vehicles, while withholding material facts from Plaintiffs and the Texas Subclass that contradicted these representations; and/or

d. Had duties under the TREAD Act and related regulations to disclose and remedy the Defect.

594. Because Ford omitted the Spontaneous Fire Defect, Plaintiffs and the Texas Subclass were deprived of the benefit of their bargain since the vehicles they purchased were worth less than they would have been if they were free from the Spontaneous Fire Defect. Had Plaintiffs and the Texas Subclass been aware of the Spontaneous Fire Defect in their vehicles, they would have either not have bought their Fire Defect Vehicles or would have paid less for them.

595. Ford's violations of the Texas DTPA present a continuing risk to Plaintiffs, the Texas Subclass, and the public. In particular and as alleged herein, Ford has yet to provide an adequate and timely fix for the Spontaneous Fire Defect. Ford has also not instructed consumers to stop driving their vehicles, and so there is still an ongoing fire risk to those on the road in or around the Fire Defect Vehicles. Ford's deceptive and acts and practices complained of herein affect the public interest.

596. Ford's deceptive acts and practices alleged herein directly and proximately caused actual damages and an ascertainable monetary loss to Plaintiffs and the Texas Subclass. Had Plaintiffs and the Texas Subclass members known the truth about the Spontaneous Fire Defect they would not have purchased or leased the vehicles or would have paid significantly less for them. Plaintiffs and the Texas Subclass also suffered ascertainable, monetary loss in the form of out-of-pocket expenses, loss of use, and lost value related to the Fire Defect Vehicles.

597. Under Tex. Bus. & Com. Code § 17.50, Plaintiffs and the Texas Subclass seek monetary relief against Ford measured as actual damages in an amount to be determined at trial, multiple damages for knowing and intentional violations, under § 17.50(b)(1), attorneys' fees, costs, and any other just and proper relief available under the Texas DTPA.

598. On July 11, 2022, certain Plaintiffs sent a letter complying with Tex. Bus. & Com. Code § 17.505(a). Because FCA failed to remedy its unlawful conduct within the requisite period, Plaintiffs seek all damages and relief to which Plaintiffs and the Texas Subclass are entitled.

**COUNT XXXVII**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Tex. Bus. & Com. Code § 2.314)**

**(Alleged by Plaintiffs Romo, Huntley, and Amores on behalf of the Texas Subclass)**

599. Plaintiffs Romo, Huntley, and Amores ("Plaintiffs" for purposes of this claim) and the Texas Subclass reallege and incorporate by reference all paragraphs as though fully set forth herein.

600. Plaintiffs bring this action on behalf of themselves and the Texas Subclass.

601. Ford is and was at all relevant times a merchant with respect to motor vehicles.

602. A warranty that the Fire Defect Vehicles were in merchantable condition is implied by law in the instant transactions. These Fire Defect Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Fire Defect Vehicles are inherently defective because they are prone to a spontaneous

and unreasonable risk of fire due to the Spontaneous Fire Defect described herein. Without limitation, the Fire Defect Vehicles share a common defect in that they are all equipped with the same component(s) in the engine compartment that make the vehicles susceptible to a risk of spontaneous fire, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Fire Defect Vehicles as well as an unreasonable risk of damage and harm to their homes and other structures, passengers, and bystanders. The Spontaneous Fire Defect renders the Fire Defect Vehicles unmerchantable and unfit for their ordinary use of driving (and parking and storing) when sold and leased, and at all times thereafter. Because of the Spontaneous Fire Defect, Ford specifically advises owners and lessees to park their vehicles away from structures.

603. Plaintiffs and the Texas Subclass were and are third-party beneficiaries of Ford's contracts with Ford-certified/authorized retailers who sold or leased the Fire Defect Vehicles to Plaintiffs and the Texas Subclass members.

604. Ford was provided notice of these issues within a reasonable time of Plaintiffs and the Texas Subclass members' knowledge of the non-conforming or defective nature of the Fire Defect Vehicles by the filing of this Complaint, by letters from Plaintiffs' counsel to Ford, consumer complaints to NHTSA regarding the Defect that is the subject of this Complaint, and by the allegations contained in this and earlier Complaints.

605. As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Texas Subclass have been damaged in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class and Subclasses, respectfully request that the Court enter judgment in their favor and against Ford, as follows:

A. Certification of the proposed Nationwide and State Subclasses, including appointment of Plaintiffs' counsel as Class Counsel;

B. Restitution, including at the election of Class and Subclass members, recovery of the purchase price of their Fire Defect Vehicles, or the overpayment for their vehicles;

C. Damages, costs, and disgorgement in an amount to be determined at trial;

D. An order requiring Ford to pay both pre- and post-judgment interest on any amounts awarded;

E. An award of costs and attorneys' fees; and

F. Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

DATED: July 11, 2022

Respectfully Submitted,

*<u>/s/ Steve W. Berman</u>*
Steve W. Berman
Thomas E. Loeser
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

Rachel E. Fitzpatrick
**HAGENS BERMAN SOBOL SHAPIRO LLP**
11 West Jefferson Street, Suite 1000
Phoenix, AZ 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
rachelf@hbsslaw.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM PC**
950 W. University Drive, Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

*Attorneys for Plaintiffs*